Michael J. Edelman, Esq.
Daniel C. Green, Esq.
Marc B. Schlesinger, Esq.
VEDDER PRICE P.C.
1633 Broadway, 31st Floor
New York, New York 10019
Telephone: (212) 407-7700
Facsimile:  (212) 407-7799
E-Mail:     mjedelman@vedderprice.com
            dgreen@vedderprice.com
            mschlesinger@vedderprice.com

*Attorneys for Attorneys for* Plaintiffs Fan Engine Securitization
Limited and Jet Engine Holding S.à r.l.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FAN ENGINE SECURITIZATION LIMITED and JET ENGINE HOLDING S.À R.L.,<br><br>                              Plaintiffs,<br><br>                   -against-<br><br>DEUTSCHE BANK TRUST COMPANY AMERICAS, as Trustee, Senior Trustee, Operating Bank and Security Trustee,<br><br>                              Defendant. | Case No. 19-cv-4318 (NRB) |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFFS FAN ENGINE SECURITIZATION LIMITED AND JET ENGINE HOLDING S.À R.L. FOR SUMMARY JUDGMENT THAT NO EVENT OF DEFAULT HAS OCCURRED UNDER THE TERMS OF THE INDENTURE AND RELATED OPERATIVE DOCUMENTS**

Dated:  July 1, 2019

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF MATERIAL FACTS................................................................................... 4

SUMMARY OF CONTRACTUAL PROVISIONS AT ISSUE ................................................ 4

ARGUMENT ............................................................................................................................. 5

I.    RELIEF IS WARRANTED UNDER THE APPLICABLE STANDARDS OF
      LAW ............................................................................................................................... 5

      A.    Summary Judgment is Warranted .......................................................................... 5

      B.    Declaratory Relief Under Rule 57 And 28 U.S.C. § 2201 Is Warranted .............. 5

II.   UNDER EXPRESS TERMS OF INDENTURE, NO PRE-MATURITY DATE
      PRINCIPAL PAYMENT EVENT OF DEFAULT EXISTS BASED UPON
      ALLEGED MISCALCULATIONS BY ADMINISTRATIVE AGENT ......................... 8

      A.    The Indenture Should Be Enforced According to its Unambiguous Terms ........ 10

      B.    The Provisions of the Indenture Provide that Alleged Miscalculations by
            Administrative Agent Cannot Constitute an Event of Default under the
            Indenture .............................................................................................................. 12

            1.    Only Payments Required under Indenture Are Payments
                  Delineated in Payment Date Schedules Prepared by Administrative
                  Agent........................................................................................................ 13

            2.    Even if True, Miscalculations by Administrative Agent Do Not
                  Constitute Events of Default under Indenture ......................................... 15

            3.    There Can Not Be a Principal Payment Default until the Series A
                  Notes Mature in 2043............................................................................... 16

III.  ISSUANCE OF DEFAULT NOTICE CONSTITUTES BREACH OF
      CONTRACT ................................................................................................................. 17

CONCLUSION....................................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.*,
  230 F.3d 569 (2d Cir. 2000).........................................................................................11

*Aetna Life Ins. Co. v. Haworth*,
  300 U.S. 227, reh'g denied, 300 U.S. 687 (1937)........................................................6

*Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*,
  No. 03 Civ. 8259, 2007 WL 1988150 (S.D.N.Y., July 10, 2007) .............................11

*Broadview Chem. Corp. v. Loctite Corp.*,
  417 F.2d 998 (2d Cir.1969)...........................................................................................6

*Celotex Corp. v. Cattrett*,
  477 U.S. 317 (1986)......................................................................................................5

*Compagnia Importazioni Esportazioni Rapresentanze v. L-3 Communs. Corp.*,
  2007 U.S. Dist. LEXIS 57870 (Bankr. S.D.N.Y 2007) (NRB) ...................................6

*Daigneault v. Yonkers Racing Corp.*,
  735 F. Supp. 62 (S.D.N.Y. 1989)................................................................................11

*Hanson v. McCaw Cellular Communications, Inc.*,
  77 F.3d 663 (2d Cir. 1996)............................................................................................5

*Harsco Corp. v. Segui*,
  91 F.3d 337 (2d Cir. 1996)..........................................................................................17

*Hunt Ltd. v. Lifschultz Fast Freight, Inc.*,
  889 F.2d 1274 (2d Cir.1989)........................................................................................10

*John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*,
  22 F.3d 458 (2d Cir. 1994).....................................................................................10-11

*Katz v. Feinberg*,
  167 F. Supp. 2d 556 (S.D.N.Y. 2001).........................................................................11

*Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*,
  925 F.2d 556 (2d Cir. 1991).......................................................................................6-7

*Knight v. U.S. Fire Insurance Co.*,
  804 F.2d 9 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987)....................................5

# TABLE OF AUTHORITIES
(continued)

Page

*Maryland Cas. Co. v. Pac. Coal & Oil Co.*,
  312 U.S. 270 (1991)............................................................................................6

*PaineWebber Inc. v. Bybyk*,
  81 F.3d 1193 (2d Cir. 1996)............................................................................5, 10

*Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*,
  350 U.S. 124 (1956)..........................................................................................10

*Trump-Equitable Fifth Ave. Co. v. H.R.H. Constr. Corp.*,
  485 N.Y.S.2d 65 (1st Dep't 1983), *aff'd*, 488 N.E.2d 115 (1985)........................11

*TVT Records v. The Island Def Jam Music Group*,
  412 F.3d 82 (2d Cir. 2005)................................................................................11

*United Mine Workers v. LTV Steel Co. (In re Chateaugay Corp.)*,
  891 F.2d 1034 (2d Cir. 1989)............................................................................11

*United States Naval Inst. v. Charter Communications, Inc.*,
  875 F.2d 1044 (2d Cir. 1989)............................................................................11

*W.W.W. Assocs. v. Giancontieri*,
  566 N.E.2d 639 (N.Y. 1990)..............................................................................10

*Wing Shing Prods (BVI) Ltd. v. Simotelex*,
  479 F. Supp. 2d 388 (S.D.N.Y. 2007).................................................................10

**Statutes**

28 U.S.C. § 2201 .................................................................................... 1, 5-6

**Rules**

Fed. R. Civ. P. 56..................................................................................................1

Fed. R. Civ. P. 56(c) .............................................................................................5

Fed. R. Civ. P. 57..............................................................................................1, 6

Local Civil Rule 56.1............................................................................................1

**Other Authorities**

22 N.Y.Jur.2d, Contracts § 196............................................................................10

Plaintiffs Fan Engine Securitization Limited ("*Fan*" or the "*Issuer*") and Jet Engine Holding S.à r.l. ("*JEH*", collectively with Fan, the "*Plaintiffs*"), by their attorneys, Vedder Price P.C., hereby submit this memorandum of law (this "*Memorandum*"), pursuant to Local Civil Rule 56.1 of the Southern District of New York, Rules 56 and 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, in support of their motion for a declaration (and for related relief): (a) that no Event of Default under the Indenture (as defined herein) has or could occur based upon allegations that the Administrative Agent[1] miscalculated the principal payments payable to the Series A Noteholders and; (b) accordingly, that Defendant Deutsche Bank Trust Company Americas (the "*Defendant*"), as trustee, senior trustee, operating bank and security trustee, breached the Indenture when it issued its Default Notice based upon alleged miscalculation.  The Plaintiffs' summary judgment motion seeking such a declaratory judgment and related relief is filed in accordance with this Court's memo endorsement of the letter agreement among the parties [Docket No. 27] (the "*Consensual Scheduling Order*").

## PRELIMINARY STATEMENT

The Securitized Loan Facility at issue here contemplates three different periods:

(a)  ***Primary Financing Period:***  the initial six-year financing period that was expected to be the lifespan of this securitized loan facility, during which the holders of Notes and the holder of the E Certificate would share the income and proceeds from the facility at an agreed allocation rate;  [*see* ¶¶ 26-28 , 30];

(b)  ***Step-Up/Cash Sweep Period:***  the sixth anniversary of the financing (on October 31, 2019) triggers both a 5% increase in the interest rate (representing a greater than 100% increase in the interest rates for the Series A Notes from 4.625% to 9.625%) and a cash sweep of available cash, with such step-up and

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in Plaintiffs' Local Civil Rule 56.1 statement of uncontested material facts filed concurrently herewith, dated July 1, 2019 (the "*Plaintiffs' Rule 56.1 Statement*").  References to paragraphs ("¶") refer to the corresponding numbered paragraphs in that Rule 56.1 Statement.  References to Exhibits ("*Exh. [__]*") are to the Exhibits annexed to the Declaration of Michael J. Edelman filed concurrently herewith (the "*Edelman Declaration*").

cash sweeps specifically designed to induce the Issuer to refinance such more expensive financing, while also specifically designed so that the cash sweep and increased interest rates would not trigger any Event of Default under the Indenture; [*see* ¶ 90 & ¶90 n.4]; and

(c) ***Final Maturity Date***: a Final Maturity Date of October 15, 2043, at which time the failure to repay any unpaid principal amounts would constitute the sole principal payment Event of Default provided for under the Indenture. [*See* ¶¶ 33-38].

This securitized loan facility has been in place for almost six years, with the Administrative Agent consistently calculating the monthly Payment Date reports for sixty-five (65) periods and the allocations of the proceeds from fourteen (14) prior engine dispositions. [*See* ¶¶ 46, 49-51, 74]. Nonetheless, the Noteholder Parties waited until five months before the commencement of the Step-Up/Cash Sweep Period to initiate their actions that are the subject of this suit. In fact, as described below, and in direct contravention of the agreed terms of the Indenture, the Noteholder Parties' actions have effectively unilaterally brought forward the commencement of the so-called Step-Up/Cash Sweep Period by five months.

Although the motivations of the Noteholder Parties are not the subject of this Summary Judgment Motion, but will be addressed in subsequent adjudication regarding damages, it is important for this Court to understand the economic context of this litigation. Here, the Noteholder Parties strategically initiated their attack upon the agreed contractual terms to strip rights and money away from the Issuer and the holder of the E Certificate after waiting literally until the very end of the six year Primary Financing Period and after sixty five Payment Period and fourteen Engine Dispositions had elapsed. The Noteholder Parties' issuance of their non-conforming Default Notice (and the threatened reissuance of such Default Notice) is preventing the Issuer and the E Certificate holder from taking time-critical actions permitted by the Indenture between May and the October 2019 Payment Date, including (a) completing desirable Engine Dispositions, (b) distributing the proceeds of Engine Dispositions, as well as making

ordinary course distributions, to the E Certificate holder, and (c) refinancing the Series A Note indebtedness before the interest rate increases by 5% *per annum* on October 31, 2019 (which interest rate step up more than doubles the interest rate from 4.625% to 9.625%).  [*See* ¶ 90].

In other words, by issuing a Default Notice when not permitted by the Indenture, the Intervenor seeks to benefit from an automatic 5% *per annum* increase (step-up) in their interest rates and a cash sweep that is contractually intended to take effect in October, but which the Intervenor has effectively brought forward to May.

The contractual terms of the Indenture and its related documents, however, do not support the Noteholder Parties' contention that the alleged miscalculations of the Administrative Agent can trigger a payment Event of Default.  Indeed, the Noteholders' claims regarding miscalculations by their own agent are contradicted by the Administrative Agent having consistently performed its duties for almost six years (with its conduct specifically vetted by KPMG's audits).  [See ¶ 71].  And a facial review of the documents demonstrates that the Noteholders Parties' issuance of the Default Notice lacks any basis under the express terms of the Indenture that governs the rights of the parties.  [*See* Exh. J (Default Notice)].  Specifically, the Noteholder Parties contentions are undercut by each of the following three fatal flaws:

- First, under the Indenture, the only payments required to be made by the Issuer are the payment amounts set forth in the monthly Payment Date Schedules. Where, as here, the Issuer has fully paid all principal and other amounts delineated as due and payable under each Payment Date Schedule, no principal or other payment default can exist.  [*See* ¶¶ 26-28].

- Second, even if the allegations regarding miscalculations are true (which the Plaintiffs dispute), those supposed miscalculations by the Noteholder Parties' own agent (the Administrative Agent) cannot constitute an Event of Default under the terms of the Indenture.  [*See* ¶¶ 39-44].

- Third, under the express terms of the Indenture, there can be no principal payment default under the Series A Notes prior to the October 2043 Final Maturity Date on such Notes.  [*See* ¶¶ 33-38].

Accordingly, the Noteholders Parties' allegations are clearly designed to cause delay and to support their efforts to ignore the terms of the Indenture and related Operative Documents. Because those express terms cannot support the Noteholder Parties' newly created and alleged Event of Default, the Plaintiffs hereby request that this Court enter a declaratory judgment that no Event of Default has occurred and grant the related relief requested by the Plaintiffs in their Summary Judgment Motion.

## STATEMENT OF MATERIAL FACTS

The material facts are set forth in the Plaintiffs' Rule 56.1 Statement and are incorporated herein by reference.   Again, (a) references to paragraphs ("¶") refer to the corresponding numbered paragraphs in that Rule 56.1 Statement and (b) references to Exhibits ("*Exh. [__]*") are to the Exhibits annexed to the Edelman Declaration.

## SUMMARY OF CONTRACTUAL PROVISIONS AT ISSUE

The Noteholders Parties' allegations translate into the following basic claim:  that certain payments of principal on the Series A Notes should have been paid earlier had the Administrative Agent not miscalculated the amounts set forth in the Payment Date Schedules. [*See* Exhs. H, I and J].  Even if true, such an allegation cannot form the basis for an Event of Default under the Indenture given its express terms.  Rather, the terms of the Indenture preclude a principal payment default until the Final Maturity Date for the Notes which, in the case of the Series A Notes, does not occur until October 15, 2043. [*See* ¶¶ 9, 33 and 36]. The material contractual provisions at issue are:

- *Indenture Section 3.06:*  mandates that the Administrative Agent delineate in monthly Payment Date Schedules all payments to be made under the Indenture. [*See* ¶¶ 24 – 26].

- *Indenture Sections 3.07 and 3.08:*  govern payment and distributions to be made under the Indenture, and provide that principal is only payable on an available

cash flow basis and that the only firm deadline for the payment of unpaid principal is the Final Maturity Date. [*See* ¶¶ 24, 26-36].

- *Indenture Section 4.01:* delineates the Events of Default that exist under the Indenture, with (a) the only potential default for the payment of principal on the Series A Notes occurring on October 15, 2043 (the Final Maturity Date) and (b) calculation or other errors by the Defendant or its agents not constituting Events of Default under the Indenture. [*See* ¶¶ 33 and 39-44].

These contractual provisions preclude the existence of any Event of Default triggered by alleged principal calculation errors by the Administrative Agent. The Noteholder Parties cannot create an event of default from the actions of their own agent (the Administrative Agent) to justify their contractually unsupportable efforts to strip (steal) rights and property away from the Plaintiffs.

## ARGUMENT

## I.     RELIEF IS WARRANTED UNDER THE APPLICABLE STANDARDS OF LAW

### A.     SUMMARY JUDGMENT IS WARRANTED

Summary judgment should be granted where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cattrett*, 477 U.S. 317 (1986); *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987).

An unambiguous contract, as is present here, may be interpreted by the court as a matter of law on a motion for summary judgment. *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996); *Hanson v. McCaw Cellular Communications, Inc.*, 77 F.3d 663, 667 (2d Cir. 1996). Accordingly, the Court can and should grant Plaintiffs summary judgment on the basis of the limited record presented on this Motion.

### B.     DECLARATORY RELIEF UNDER RULE 57 AND 28 U.S.C. § 2201 IS WARRANTED

The Plaintiffs seek a declaration pursuant to Rule 57 of the Federal Rules of Civil Procedure, as contemplated by 28 U.S.C. § 2201, that no Event of Default has occurred, nor is

any such Event of Default possible, based upon the allegations asserted by the Defendant under the Default Notice and the associated Instruction Letter.

The Declaratory Judgment Act, 28 U.S.C. § 2201, provides, in pertinent part that:

> In a case of **actual controversy** within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201; *see also* Fed. R. Civ. P. 57.  Declaratory judgment may be granted where the facts establish "a substantial controversy, between the parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1991).  The controversy must be "real and substantial . . . admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, reh'g denied, 300 U.S. 687 (1937).

In determining whether to issue a declaratory judgment, "[t]he two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.  It follows as a general corollary to this rule that if either of these objectives can be achieved the action should be entertained and the failure to do so is error."  *Broadview Chem. Corp. v. Loctite Corp.,* 417 F.2d 998, 1001 (2d Cir. 1969) (internal citations omitted); *see also Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991) (same; applying test to threatened securities law claims); *Compagnia Importazioni Esportazioni Rapresentanze v. L-3 Commc'ns Corp.*, 2007 U.S. Dist. LEXIS 57870, at 14-15 (Bankr. S.D.N.Y 2007) (NRB) (same; applying test to a breach of contract dispute).  "Whether a real and

immediate controversy exists in a particular case is a matter of degree and must be determined on a case-by-case basis." *Kidder, Peabody,* 925 F.2d at 562.

In *Kidder, Peabody,* the Second Circuit ruled that declaratory relief was mandated under a similar set of circumstances as exist here.  In that case, the defendant had threatened to bring a securities claim against the plaintiff, but then stated that it would refrain from doing so.  *Id.*  The plaintiff then commenced suit seeking a declaratory judgment that it was not liable for the threatened federal securities law violations.  Even though the defendant had stated that it would refrain from asserting such claims against the plaintiff, the Second Circuit held that in the absence of a binding settlement or other permanent bar to such claims, the plaintiffs' action for declaratory relief was proper.  As the Second Circuit reasoned, "[w]ithout a declaratory judgment, [the defendant] again could put [the plaintiff] to the task of defending against federal securities claims." *Id.*, at 563.

There can be no question about the existence of an actual, real and immediate controversy between the parties that supports the issuance of a declaratory judgment by this Court.  In the instant case, the need for declaratory relief is even greater than in *Kidder, Peabody*.  Rather than stating that it would voluntarily refrain from bringing a claim (as in *Kidder, Peabody*), the Defendant here (a) actually took enforcement action against the Issuer, (b) withdrew its enforcement action only due to this Court's temporary Injunctive Order that mandated such withdrawal and (c) has informed this Court that it is seeking to unwind such injunctive restraints so that it can reissue its Default Notice.  *See* Rule 56.1 Statement, ¶ 6.  Further, pending this Court's determination regarding whether an Event of Default exists, a substantial amount of distributions are being withheld from the Plaintiffs.  In these circumstances, there is not only a threat here, but an actual, real and immediate controversy

between the parties.  Declaratory relief is mandated and as such "will serve a useful purpose in clarifying and settling the legal relations in issue."  Indeed, the declaratory relief sought will resolve the main issue in dispute – whether an Event of Default exists – which will resolve whether the respective rights are governed by the default or non-default distribution waterfalls under the Indenture.

Further, declaratory relief is also warranted as it "will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding."  In sum, the threatened re-issuance of the Default Notice, which has been withdrawn only due to this Court's temporary Injunctive Order, creates a real and present controversy mandating this Court's declaratory relief that no Event of Default has occurred and is continuing.

## II.   UNDER EXPRESS TERMS OF INDENTURE, NO PRE-MATURITY DATE PRINCIPAL PAYMENT EVENT OF DEFAULT EXISTS BASED UPON ALLEGED MISCALCULATIONS BY ADMINISTRATIVE AGENT

This action arises from the controversy between the parties regarding whether a principal payment Event of Default exists under the Indenture:

    (a)    without any basis or proof, and contrary to how payments have been calculated for sixty-five (65) monthly Payment Date distributions and fourteen (14) Engine Disposition distributions, the Noteholder Parties now claim that the Administrative Agent has miscalculated the payments to be made to the holders of Series A Notes;

    (b)    the Noteholder Parties now claim that as a consequence of such alleged miscalculations, the holders of Series A Notes should have received earlier and larger partial repayments of principal under the Series A Notes;

    (c)    Accordingly, the Noteholder Parties directed the Defendant to declare a principal payment Event of Default under the Indenture; and

    (d)    solely based upon such unsupported and unsubstantiated allegations set forth in the Noteholder Parties' Direction Letter, the Defendant issued its Default Notice declaring that an Event of Default had occurred and accelerated the principal on the Notes.

The Noteholder Parties' allegations, however, ignore the express terms of the Indenture.

As set forth below, the governing contracts between the parties demonstrate that the Noteholder Parties' allegations of miscalculations cannot form the basis for the occurrence of an Event of Default under the express terms of the Indenture.   First, under the terms of the Indenture, the only payments required to be made are the payment amounts set forth in the monthly Payment Date Schedules.   [*See* ¶¶ 26-28]. Here, where the Issuer has fully paid all principal amounts (and other amounts) stated to be due and payable under each Payment Date Schedule, no principal payment (or other type of payment) default can exist under the Indenture. [*See* ¶¶ 45-52]. Second, the alleged miscalculations by the Administrative Agent do not constitute any type of Event of Default under the Indenture.   [*See* ¶¶ 53-66]. There may be an independent cause of action by the Holders of the Series A Notes against the Defendant (who is responsible for the actions of its Agent), but there is no Event of Default that can be alleged against the Issuer for such types of allegations.   Third, under the express terms of the Indenture, there can be no principal payment default under the Series A Notes prior to the October 2043 Final Maturity Date on such Notes.   [*See* ¶ 9, 36-38 and 66]. For each of these reasons, the Noteholder Parties' allegations cannot support any Event of Default prior to October 2043.[2] Accordingly, this Court should provide the Plaintiffs with a declaratory judgment implementing the express terms of the Indenture.

---

[2] There are further grounds supporting the lack of any Event of Default here.   The Defendant's Default Notice attacks payment calculations consistently performed by the Administrative Agent each month for the past 65 monthly Payment Dates and for 14 Engine Dispositions.   The Defendant's attack is thus invalidated, among other reasons, as counter to the "course of performance" of the Indenture within the meaning of N.Y. U.C.C. § 1-303(a) for the past 65 Payment Periods.

### A.      THE INDENTURE SHOULD BE ENFORCED ACCORDING TO ITS UNAMBIGUOUS TERMS

Contractual interpretation is governed by state law.  *Wing Shing Prods (BVI) Ltd. v. Simotelex*, 479 F. Supp. 2d 388, 404 (S.D.N.Y. 2007).  Here, each of the Indenture and the Notes provides that such agreements are to be governed by and construed in accordance with the laws of the State of New York.[3]

Under New York law, "[a] familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."  *W.W.W. Assocs. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).  "The cardinal rule of contract interpretation is to ascertain and give effect to the parties' expressed intentions."  *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir. 1989*)*; *see also Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124, 142 (1956) ("the cardinal rule in the interpretation of contracts is that the intention of the parties should be ascertained and enforced"); 22 N.Y.Jur.2d, Contracts § 196 (same).

When interpreting a contract, the "plain meaning" of words and phrases should be given effect.  *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1196 (2d Cir. 1996).  Moreover, when the words are clear and unambiguous, the express language of the agreement is the only source of the parties' intent.  *See John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994) (where there is no ambiguity, there is "no reason to look outside the

---

[3]  *See* Exh. A (Offering Memorandum) ("The Indenture, the Notes and the Administrative Agency Agreement are to be governed by and construed in accordance with the laws of the State of New York"); Exh. B (Indenture), § 12.09 (Indenture is governed by New York law); Exh. B (Indenture), Exhibits A-1 and A-2 to Indenture (Series A Notes governed by New York law); Exh. C (Security Agreement), §9.08 (Security Agreement is governed by New York law); Exh. D (Administrative Agency Agreement), § 10.02 (Administrative Agency Agreement is governed by New York law).

contract"); *see also Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.,* No. 03 Civ. 8259, 2007 WL 1988150, at *10 (S.D.N.Y., July 10, 2007) (same).   Only when provisions are ambiguous may courts look to extrinsic factors.   *See United Mine Workers v. LTV Steel Co. (In re Chateaugay Corp.),* 891 F.2d 1034, 1038 (2d Cir. 1989).   Although a court may consider extrinsic evidence when it serves to explain or interpret a contract, such evidence may not be used to vary or contradict the clear terms of a contract.   *Cf., Daigneault v. Yonkers Racing Corp.*, 735 F. Supp. 62, 64 (S.D.N.Y. 1989).

Furthermore, contracts should be interpreted so as to give full meaning and effect to all of their provisions.   *Trump-Equitable Fifth Ave. Co. v. H.R.H. Constr. Corp.*, 485 N.Y.S.2d 65, 67 (1st Dep't 1983), *aff'd*, 488 N.E.2d 115 (1985).   In other words, contracts should be interpreted "in such a way that no language is rendered superfluous."   *Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp.,* 230 F.3d 569, 576 (2d Cir. 2000); *see also Katz v. Feinberg*, 167 F. Supp. 2d 556, 567 (S.D.N.Y. 2001) ("all provisions of a contract should be given effect if possible").   A court should read the contract "in a way that ascribes meaning, if possible, to all of its terms." *United States Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1049 (2d Cir. 1989) (citations omitted).

Further, "[u]nder New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.'"   *TVT Records v. The Island Def Jam Music Group*, 412 F.3d 82, 89 (2d Cir. 2005) (citations omitted).

With these general tenets of contractual construction in mind, the contractual provisions regarding the Indenture's payment mechanics and the scope of Events of Default under the Indenture dictate that no Event of Default can have occurred.   The express terms of the Indenture

and related Operative Documents provide that (a) the only payments required to be made under the Indenture are the amounts delineated by the Administrative Agent in its monthly Payment Date Schedules; (b) alleged miscalculations by the Administrative Agent do not, and cannot, constitute Events of Default under the Indenture; and (c) there can be no principal payment Event of Default until the Series A notes mature in October 2043.   Each of these contractual terms yield the same result – that no Event of Default has occurred or can occur based upon the miscalculations asserted by the Noteholder Parties.

**B.   THE PROVISIONS OF THE INDENTURE PROVIDE THAT ALLEGED MISCALCULATIONS BY ADMINISTRATIVE AGENT CANNOT CONSTITUTE AN EVENT OF DEFAULT UNDER THE INDENTURE**

The terms of the Operative Documents unambiguously provide that no Event of Default has occurred based upon the allegations asserted by the Noteholder Parties in their Direction Letter and the Default Notice.   Specifically, under the terms of the Indenture:

- The only payments required to be made under the Indenture are the amounts set forth in the monthly Payment Date Schedules (and all such payments have been fully made).   [*See* ¶¶ 9, 26-28; 69-75 and 85].

- Even if the Noteholder Parties' allegations are correct, miscalculations by the Administrative Agent do not constitute an Event of Default under the terms of the Indenture.   [*See* ¶¶ 62-66 and 85].

- Prior to the October 2043 Final Maturity Date for the Series A Notes, there is no Event of Default for the failure to pay principal.   Rather, principal is payable only to the extent that cash flows (which are controlled by the Administrative Agent) are sufficient to pay the so-called Scheduled Principal Payment Amounts.   [*See* Exh. A (Offering Memorandum), at 25].   As set forth in the Offering Memorandum:   "***A failure to pay Scheduled Principal Payment Amounts on the Series X Notes or Series A Notes on any Payment Date prior to the applicable Final Maturity Date will not be an Event of Default.***"   [*Id.* (emphasis in original)]

In sum, alleged miscalculations by the Administrative Agent do not and cannot constitute an Event of Default under the express contractual terms of the Indenture.   Accordingly, it is proper

for this Court to enter summary judgment in favor of the Plaintiffs declaring that no Event of Default has occurred.

### 1.   Only Payments Required under Indenture Are Payments Delineated in Payment Date Schedules Prepared by Administrative Agent

Under the express terms of the Indenture, there cannot be a payment Event of Default unless payments required to be made under a Payment Date Schedule as prepared by the Administrative Agent were not made.  Here, the Issuer has properly and timely made *all* such payments.  In fact, the Defendant's own agent has specifically admitted that all payments were properly and timely made and that no Event of Default has occurred.

The Indenture establishes the following procedure for the Issuer to make payments on each Payment Date:

(a)   First, the Administrative Agent calculates the amounts "due and payable" on each Payment Date and prepares a so-called "Payment Date Schedule" which it distributes at least two business days prior to the Payment Date. [*See* Exh. B (Indenture), § 3.06.  The Payment Date Schedule sets forth "in respect of each Series of Notes, the amount to be applied on such Payment Date to pay all interest, principal and premium, if any, on such Series of Notes . . . ." [*See* Exh. B (Indenture), 3.06(h)].

(b)   Second, the Administrative Agent directs payments of the amounts set forth in the Payment Date Schedule.  [*See* Exh. B (Indenture), § 3.08]

(c)   Third, Section 3.08(a) of the Indenture contains an ordinary-course, non-default payment waterfall which sets out, among other things, payments and distributions to both holders of Notes and the holder of the E Certificate.  [*See* Exh. B (Indenture), § 3.08(a)].

The Administrative Agent has followed these same procedures now for almost six years, covering sixty-five (65) Payment Periods and fourteen (14) Engine Dispositions.  [*See* ¶¶ 72-74].  Section 3.08(a) of the Indenture is deliberately drafted so that there can be no breach of payment obligations by the Issuer if it makes all payments on the Payment Date in accordance with the Payment Date Schedule as calculated and directed by the Administrative Agent.

-13-

The Indenture limits payment "Events of Default" to three situations, none of which encompass supposed calculation errors by the Administrative Agent:

- ***Section 4.01(a) addresses the failure to pay interest***: "[F]ailure to pay when due the Interest Amount on the Senior Series, and the continuance of such default unremedied for a period of five (5) Business Days after the same shall have become due and payable…" [*See* Exh. B (Indenture), § 4.01(a)].

- ***Section 4.01(b) addresses the failure to pay principal***: "[F]ailure to pay the outstanding principal of any Note or failure to pay all accrued and unpaid Interest Amounts on any Note, in each case, on the applicable Final Maturity Date…" [*See* Exh. B (Indenture, § 4.01(b)). As detailed above, there can be no principal payment Event of Default under the Series A Notes until October 15, 2043. [*See* ¶ 9, 36-38 and 66].

- ***Section 4.01(c) addresses the failure to pay other (non-principal or interest) amounts***: "[F]ailure to pay any amount (other than a payment default for which provision is made in clause (a) or (b) of this Section 4.01) ***when due and payable*** in connection with any Note, to the extent that there are, on any Payment Date, amounts available for such payment in the Collections Account or under the Liquidity Facility, and the continuance of such default for a period of five (5) or more Business Days after such Payment Date…" [*See* Exh. B (Indenture), § 4.01(c) (emphasis added].

[*See* ¶¶ 39-44]. Furthermore, an amount can be "due and payable" only when it is set forth in a Payment Date Schedule. [*See* ¶¶26-28]. Accordingly, as long as the Issuer continues to fully make payments delineated in the Payment Date Schedule, there can be no payment default under Sections 4.01(a), (b) and/or (c) of the Indenture.

In the instant case, for each of sixty-five monthly Payment Dates from the closing of the Securitized Loan Facility through April 2019, the Administrative Agent has prepared a Payment Date Schedule and the Issuer has fully paid the amounts listed therein. [*See* Exh. G (Administrative Agent's Response)]. As also confirmed by the Administrative Agent, the monthly payments and distributions of Engine Disposition proceeds have all fully complied with the provisions of the Indenture. [*Id.*] Furthermore, KPMG has conducted an annual audit of the Securitized Loan Facility, and has specifically audited the monthly payments and Engine

Disposition proceeds allocations, and "KPMG has repeatedly opined that the Administrative Agent's calculations were proper."  [*Id.*]

In sum, all calculations and distributions made by the Administrative Agent have been effected in accordance with the Indenture.

> **2.      Even if True, Miscalculations by Administrative Agent
> Do Not Constitute Events of Default under Indenture**

Even if the Defendant's allegation regarding miscalculations by its own agent (the Administrative Agent) are correct, they cannot and do not constitute an Event of Default under the Indenture.  [*See* Exh. B (Indenture), § 4.01].

In their Direction Letter Supplement, the Noteholder Parties claimed that a payment default existed under Section 4.01(c) of the Indenture because two distinct sets of calculations made by the Defendant's Administrative Agent were in error:   (a) calculations relating to payments following engine dispositions; and (b) calculations regarding regular distributions from the inception of the transaction.  [*See* Exh. I (Direction Letter Supplement)].  As detailed in the Administrative Agent's Response, neither allegation is supported by the facts or the terms of the Indenture.   [*See* Exh. G].   More importantly, even if there were any merit to allegations of miscalculations (and there is not), calculation errors by the Administrative Agent do not constitute an Event of Default under Section 4.01(c) or under any other provision of the Indenture.  [See ¶¶ 39-44; 59-66].

Although the Noteholder Parties invoked Section 4.01(c) (addressing the failure to pay non-principal or interest) amounts, the alleged miscalculations do not fall within the scope of a Section 4.01(c) default.  Only amounts listed in a Payment Date Schedule are required to be paid by the Issuer under the terms of the Indenture.  [*See* ¶¶26-28].  But the Noteholder Parties failed to identify any payment that was: (a) set forth in a Payment Date Schedule; *and* (b) not actually

paid.  [*See* ¶64].  In fact, the Noteholder Parties never alleged that the Administrative Agent has ever departed from any Payment Date Schedule at all.  [*Id.*]

Such allegations also do not fit within any of the specific types of Event of Default listed in the Indenture (at Section 4.01 thereof):

- *Section 4.01(a) – Interest Payments:*  addresses only interest payment defaults, which have no applicability here.
- *Section 4.01(b) – Principal Payments upon Maturity Date:*  addresses only principal payment defaults, which can only exist upon the occurrence of the March 15, 2043 Final Maturity Date for such Notes (as such date is almost twenty five years from now, such provision is inapplicable).
- *Section 4.01(c) – Other Payments:*  applies only to non-interest/non-principal payments, rendering such provision inapplicable to the alleged principal payment defaults.  Further, only payments listed within a Payment Date Schedule are due and payable under the Indenture.  Accordingly, a Section 4.01(c) default is likewise inapplicable.
- *Section 4.01(d) – Other Covenants/Obligations:*  only applies to Issuer's breach of covenants and nonpayment obligations.  Such provision is not applicable to an Administrative Agents' miscalculations.
- *Section 4.01(e) & (f) – Bankruptcy/Insolvency*:  limited to bankruptcy, judicial insolvency or receivership under the Indenture – none of which have any bearing to the alleged facts here.
- *Section 4.01(g) – Large Judgment Default:*  deals with large judgments and accordingly has no application here.

*See*  Exh. B, § 4.01.

Those are the *only* Events of Default that exist under the Indenture.  In sum, the allegations of miscalculations by the Administrative Agent leading to a claimed failure to pay amounts that are not delineated in any Payment Date Schedule simply cannot comprise any type of Event of Default under the Indenture.

### 3.     There Cannot Be a Principal Payment Default Until the Series A Notes Mature in 2043

Under the express terms of the Indenture, there can be no principal Event of Default for the Series A Notes until the Final Maturity Date of October 15, 2043.  [*See* ¶ 38].  The Offering

Memorandum further confirms that there can be no principal payment default prior to the Final

Maturity Date:

> Although there are specified Scheduled Principal Payment Amounts for the . . .
> Series A Notes for each Payment Date, the amount of the principal payments
> actually made on the . . . Series A Notes on any Payment Date will not be fixed in
> amount but rather will depend primarily on the [lease rental payments] and other
> revenues collected during the preceding month and on the [expenses] and other
> items to be paid or funded on the payment date.
>
> ***A failure to pay Scheduled Principal Payment Amounts on the . . . Series A
> Notes on any Payment Date prior to the applicable Final Maturity Date will not
> be an Event of Default.***

[*See* Exh. A (Offering Memorandum), at 25 (emphasis in original); *see also* ¶ 36].

The Noteholder Parties ignored this restriction when they alleged a present principal

payment default under the Indenture.  Principal payment defaults for the Series A Notes cannot

arise until the October 15, 2043 Final Maturity Date, so even if factually accurate (which it is

not), the Noteholder Parties' direction letter is a quarter of a century too early.  In sum, there

cannot be an Event of Default triggered by a failure to pay principal with respect to the Series A

Notes until the occurrence of the Final Maturity Date for such Notes—which is October 15,

2043.  [*See* ¶¶ 9, 33, 36 and 66].

### III.   ISSUANCE OF DEFAULT NOTICE <br> CONSTITUTES BREACH OF CONTRACT

Under New York law, there are four elements to a breach of contract claim:  "(1) the

existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach

of contract by the defendant, and (4) damages."  *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d

Cir. 1996).  Here, there is no dispute that an agreement existed amongst the parties (the Indenture

and the other Operative Documents).  Nor is there any dispute regarding the Plaintiffs having

fully performed their obligations under such contracts.  As set forth above, there was no Event of

Default that was – or could be – triggered even if the factual averments of the Noteholder Parties are accurate.  In such circumstances, the Noteholder Parties' issuance of the Default Notice in the absence of an Event of Default constitutes a breach of contract claim.  Accordingly, under this Summary Judgment Motion, the Plaintiffs seek a determination that all of the elements of breach of contract claim are satisfied, except that, in accordance with the Consensual Scheduling Order, the amount of damages should be reserved for determination at a later date.[4]

---

[4] Under the Consensual Scheduling Order, the Plaintiffs, Defendant and the Noteholder Parties agreed that the following matters would not be addressed by this Summary Judgment Motion:  (a) whether the calculations made by the Defendant and/or its agents under the Indenture and related operative documents were accurate, (b) whether the Defendant properly relied upon the instructions from the Noteholder Parties, (c) damages (if any) that arose if such event of default notice was improperly issued and (d) any other defenses against the alleged Event of Default or Default Notice that Plaintiffs may assert that were not raised by Plaintiffs in their Summary Judgment Motion.

## <u>CONCLUSION</u>

For the reasons set forth herein and the related papers filed in support of the Plaintiffs'

Summary Judgment Motion, the Plaintiffs respectfully request that this Court enter an Order, in

substantially the form annexed as Exhibit Z to the Motion, that, *inter alia*:

(a)   declares that no Event of Default has occurred or is continuing and, accordingly, that the terms of the Indenture in effect in the absence of an Event of Default shall be given effect and govern the rights of the respective parties under the Indenture; and

(b)   determines that the issuance of the Default Notice was in breach of the express terms of the Indenture; and

That this Court grant such other and further relief as this Court deems just and proper.

Dated: New York, New York        Respectfully submitted,
       July 1, 2019

                                    **VEDDER PRICE P.C.**


By: /s/ Michael J. Edelman
    Michael J. Edelman
    Daniel C. Green
    Marc B. Schlesinger
    1633 Broadway, 31st Floor
    New York, New York 10019
    Telephone:  (212) 407-7700
    Facsimile: (212) 407-7799
    E-Mail:  mjedelman@vedderprice.com
              dgreen@vedderprice.com
              mschlesinger@vedderprice.com

*Attorneys for Plaintiffs Fan Engine Securitization Limited and Jet Engine Holding S.à r.l.*

## List of Exhibits annexed to the Edelman Declaration

Exhibit A                    Offering Memorandum

Exhibit B                    Indenture

Exhibit C                    Security Agreement

Exhibit D                    Administrative Agency Agreement

Exhibit E                    May 13, 2019 Hearing Transcript

Exhibit F                    April 2019 Payment Date Schedule

Exhibit G                    Administrative Agent's Response

Exhibit H                    Original Direction Letter

Exhibit I                    Direction Letter Supplement

Exhibit J                    Default Notice