Michael J. Edelman, Esq.
Daniel C. Green, Esq.
Marc B. Schlesinger, Esq.
VEDDER PRICE P.C.
1633 Broadway, 31st Floor
New York, New York 10019
Telephone: (212) 407-7700
Facsimile: (212) 407-7799
E-Mail:    mjedelman@vedderprice.com
           dgreen@vedderprice.com
           mschlesinger@vedderprice.com

*Attorneys for Attorneys for* Plaintiffs Fan Engine
Securitization Limited and Jet Engine Holding S.à r.l.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| FAN ENGINE SECURITIZATION LIMITED and JET ENGINE HOLDING S.À R.L., | | |
| Plaintiffs, | | Case No. 19-cv-4318 (NRB) |
| -against- | | |
| DEUTSCHE BANK TRUST COMPANY AMERICAS, as Trustee, Senior Trustee, Operating Bank and Security Trustee, | | |
| Defendant. | | |

**PLAINTIFFS FAN ENGINE SECURITIZATION LIMITED AND JET ENGINE HOLDING S.À R.L.'S STATEMENT UNDER LOCAL CIVIL RULE 56.1 OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT THAT NO EVENT OF DEFAULT HAS OCCURRED UNDER TERMS OF INDENTURE AND RELATED OPERATIVE DOCUMENTS**

Plaintiffs Fan Engine Securitization Limited ("*Fan*" or the "*Issuer*") and Jet Engine

Holding S.à r.l. ("*JEH*", collectively with Fan, the "*Plaintiffs*"), by their attorneys, Vedder Price

P.C., and pursuant to Local Civil Rule 56.1 of the Southern District of New York, Rules 56 and

57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, hereby set forth their statement

1

of uncontested material facts as follows upon which they rely in connection with their motion for summary judgment seeking declaratory and related relief that no event of default under the Indenture[1] has occurred based upon the allegations that the Administrative Agent miscalculated the principal payments payable to the Series A Noteholders and, accordingly, that Defendant Deutsche Bank Trust Company Americas (the "*Defendant*"), as trustee, senior trustee, operating bank and security trustee, breached the Indenture when it issued its Default Notice based upon such allegations of miscalculation:[2]

## STATEMENT OF THE CASE

1.      The Plaintiffs commenced this action on May 13, 2019 after the Defendant issued on May 9, 2019 a notice of the occurrence of an Event of Default (as defined in the Indenture, an "*Event of Default*") and acceleration of the Notes (as defined herein) issued by the Issuer under the Indenture (as defined herein) (such May 9, 2019 notice of event of default and acceleration, the "*Default Notice*").  In this action, the Plaintiffs are seeking (a) injunctive relief to compel the withdrawal of the Default Notice, (b) declaratory relief seeking a declaration that no Event of Default (as defined in the  Indenture) has occurred or is continuing, (c) damages[3] arising from the Defendant's (i) breach of contractual obligations, (ii) breach of the implied covenant of good faith and fair dealing, (iii) conversion and (iv) gross negligence.  [Docket No. 1 (the "Complaint"), at ¶1].

2.      In addition, immediately after filing the Complaint, the Plaintiffs filed an emergency motion, dated May 13, 2019 (the "*Emergency Motion*"), seeking, *inter alia*, a

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in Plaintiffs' Rule 56.1 Statement.

[2] Exhibits referenced herein as "*Exh.* [__]" refer to the exhibits annexed to the Declaration of Michael J. Edelman, dated July 1, 2019 (the "*Edelman Declaration*"), filed in connection herewith.

[3] Ascertaining the damages suffered by the Plaintiffs is part of the Complaint, but is not the subject of the Plaintiffs' Summary Judgment Motion.

temporary restraining order to compel the Defendant's immediate withdrawal of its Default Notice.  [Docket Nos. 3-5].

3.     After conducting a hearing on the Plaintiffs' Emergency Motion on May 13, 2019, this Court determined that issuance of an injunctive order was appropriate and entered an order on May 14, 2019 [Docket No. 3], granting such injunctive relief  (the "*Injunctive Order*").  In addition, this Court enjoined the distribution of funds to JEH under the Indenture (the funds so enjoined from distribution and/or disbursement, the "*Disputed Amounts*") pending further order of this Court while this Court determined whether an Event of Default had occurred.  *See* Injunctive Order, at 2.

4.     On May 28, 2019, Loomis Sayles Investment Grade Bond Fund, Loomis Sayles Bond Fund, Loomis Sayles Investment Grade Fixed Income Fund and NHIT: Securitized Credit Trust (collectively, "*Loomis*" or the "*Intervenor*"), filed a letter motion with this Court to be permitted to intervene as an interested third party in this action.  [Docket No. 10].  At a telephonic status conference held on June 20, 2019, after determining that allowing the intervention of Loomis would not affect this Court's diversity jurisdiction, this Court granted the Intervenor's request to intervene in this action as an interested third party.

5.     After the June 20, 2019 status conference, the Plaintiffs, the Defendant and the Intervenor conferred and reached an agreement regarding the scope and timing of the next stages of this action, including the filing of a dispositive Summary Judgment Motion by the Plaintiffs regarding whether the alleged Event of Default existed under the terms of the Indenture to support the issuance of the Default Notice.  [Docket No. 26].  The parties also agreed that  the Plaintiffs' Summary Judgment Motion would not address:  (a) whether the calculations made by the trustees and/or agents under the Indenture and related Operative Documents (as defined herein) were

accurate, (b) whether the Defendant properly relied upon the instructions from Loomis, (c) damages (if any) that arose if such Event of Default notice was improperly issued or (d) any other defenses against the alleged Event of Default or notice of default that Plaintiffs may assert that are not raised by the Plaintiffs in the Summary Judgment Motion.  [*Id.*]  On June 26, 2019, the Plaintiffs filed the consensual scheduling letter delineating such matters for the Court.  [*Id.*]  On June 26, 2019, this Court entered a memo endorsement of such scheduling letter agreement among the parties [Docket No. 27 (the "*Consensual Scheduling Order*")].

6.      Although the Injunctive Order required the withdrawal of the Default Notice, such withdrawal was mandated only under the temporary Injunctive Order (which is not a final, permanent, injunction).  *See* Injunctive Order, at 3.  Indeed, each of the Defendant and the Intervenor has stated their intent to "contest such constraint" and to "vindicate" their right to be able to issue such a Default Notice.  *See* Docket No. 19, at 2  (Defendant's admission of its intent to preserve right to issue reissue its Default Notice); Docket No. 10, at 2 (Loomis' intent to intervene to preserve rights to issue a Default Notice).

7.      As contemplated under the Consensual Scheduling Order, this Local Civil Rule 56.1 Statement and related summary judgment papers (this "*Summary Judgment Motion*") constitute the Summary Judgment Motion to address whether an Event of Default has occurred that supports the Defendant's issues of its Default Notice.

### MATERIAL FACTS UNCONTESTED; CONTRACT-BASED DISPUTE

8.      The material relevant facts required to adjudicate the Summary Judgment Motion are not in dispute.

9.      The Issuer is required to make payments under the Indenture only in accordance with Payment Date Schedules prepared by the Administrative Agent and has timely and fully paid all such required amounts.  [Exh. E (May 13, 2109 Hearing Transcript), at 3-4; Exh. G (the

"*Administrative Agent's Response*"), at 2]; s*ee infra*, at ¶¶ 26, 45–52.   Furthermore, under the express terms of the Indenture and the Operative Documents, principal on the Series A Notes does not become due and payable until October 15, 2043 (the "*Final Maturity Date*").  [Exh. A (Offering Memorandum), at 1; Exh. B (Indenture), at 16 (definition of Final Maturity Date for the Series A Notes].  Accordingly, there is no factual basis supporting the Defendant and the Intervenor's claim that a principal payment default has occurred that constitute an Event of Default supporting the issuance of the Default Notice.  The dispute between the Plaintiffs, on the one hand, and the Defendant and the Intervenor (collectively, the "*Noteholder Parties*"), on the other, concerns the application of undisputable facts to the express terms of the Indenture and related transaction documents.

A.   **THE PARTIES AND FAN'S BUSINESS**

10.   Plaintiff Fan is a special purpose company organized under the laws of Ireland that owns a fleet of aircraft engines (the "*Aircraft Engines*").  [Exh. A, at 1, 75].  Fan's primary business is leasing, managing, disposing of and otherwise administering the Aircraft Engines. [Exh. A, at 1, 75].

11.   Fan finances its operations pursuant to a securitized loan facility that it entered into on October 31, 2013 (the "*Securitized Loan Facility*") under which Fan borrowed $169,500,000.00 of new loans.  [Exh. A, at 1; Exh. B, at 1].

12.   At closing of the Securitized Loan Facility, the appraised value of the Aircraft Engines exceeded $250 million.  *See* October 18, 2013 Final Offering Memorandum for the Securitized Loan Facility (the "*Offering Memorandum*").  [Exh. A, at 1].

13.   Plaintiff JEH is the E Certificate holder (as defined *infra*) which owns the beneficial ownership interests of the Issuer.  *See* Docket 1, ¶6.

14.     The Defendant is the "Trustee", "Operating Bank", "Senior Trustee" and "Security Trustee" (as each such term is defined in the Indenture) under the Indenture.  [Exh. B, §1.01 at 26, 38, 39 and 44].

15.     The Intervenor is the holder of approximately 70% of the outstanding Series A Notes issued under the Indenture.  *See* Docket No. 10, at 1.

**B.     THE OPERATIVE DOCUMENTS**

16.     The applicable rights and obligations of the parties under the Securitized Loan Facility are set forth in the following operative documents for the Securitized Loan Facility (collectively, the "*Operative Documents*").

**(1)     THE INDENTURE**

17.     Issuer, the Defendant, as trustee, nonparty Phoenix American Financial Services, Inc., as administrative agent (in such capacity, the "*Administrative Agent*"), and nonparty BNP Paribas, as the initial liquidity facility provider, are parties to a Trust Indenture, dated as of October 31, 2013 (the "*Indenture*").  [Exh. B (Indenture)].

18.     Two classes of notes (the "*Notes*") were issued under the Indenture: (a) the "Series A Notes" with an initial outstanding balance of $161,000,000 [Exh. B (Indenture), § 1.01 at 39 (definition of Series 2013-A1-Notes) (the "*Series A Notes*")]; and (b) the "Series X Notes" with an initial outstanding balance of $8,500,000.  [Exh. B (Indenture), § 1.01 at 39 (definition of Series 2013-IX-Notes) (the "*Series X Notes*")].  In addition, an "E Certificate" with an original outstanding principal amount of $89,678,000 was issued by Fan in favor of JEH (the "*E Certificate*"), which certificate replaced a similar preexisting obligation.  [Exh. B  (Indenture), § 1.01 at 11 (definition of E Certificates)].

19.     As detailed *infra*, among other things, the Indenture establishes payment and distribution terms for the Notes and the E Certificate, and sets forth the Events of Default (as

defined in the Indenture, the "*Events of Default*") and associated remedies under the Securitized Loan Facility.  *See infra* at ¶¶ 26-28 and 39-44.

**(2)     THE SECURITY AGREEMENT**

20.     Fan, its subsidiaries and the Defendant, as Security Trustee (as defined in the Indenture, the "*Security Trustee*") and as Operating Bank (as defined in the Indenture), also entered into a Security Trust Agreement, dated as of October 31, 2013 (the "*Security Agreement*").  [Exh. C (Security Agreement)].

21.     Under the granting clause of the Security Agreement, and subject to the terms, provisions and limitations set forth in the Operative Documents, Fan and its subsidiaries granted security interests in favor of the Defendant, as Security Trustee, in, among other things, all of the Aircraft Engines and all of the leases of such Aircraft Engines.  [Exh. C (Security Agreement), § 2.01].

22.     Under the terms of the Security Agreement, the Defendant acts as Security Trustee for, among others, each holder of the Notes and JEH, as holder of the E Certificate.  [Exh. C (Security Agreement), § 1.01 at 9 (definition of Secured Party)].

**(3)     THE ADMINISTRATIVE AGENCY AGREEMENT**

23.     Fan, as Issuer, its subsidiaries, the Defendant, as Security Trustee, and the Administrative Agent also entered into that certain Amended and Restated Administrative Agency Agreement, dated as of October 31, 2013 (the "*Administrative Agency Agreement*"). [Exh. D (Administrative Agency Agreement)].

24.     Under the Administrative Agency Agreement, the Administrative Agent was appointed "for the benefit of the Security Trustee" and "exclusively as  the agent of the Security Trustee and not in any agency or other capacity on behalf of any Issuer Group Member [which includes, *inter alia,* the Issuer]" to provide various "bank account management calculation

7

services" including calculating all amounts payable and making distributions on each monthly "Payment Date" (as defined in the Indenture, the "*Payment Date*") in accordance with those calculations.  [Exh. B (Indenture), §§ 3.06 and 3.08(a) and Exh. D (Administrative Agency Agreement), §§ 2.01(b), 201(c) and 2.04(e)].  In sum, under Sections 2.01(b) and 2.04 of the Administrative Agency Agreement (and as expressly confirmed in Section 10.10 of the Administrative Agency Agreement), the Administrative Agent acts as the agent for the Defendant to calculate the amounts payable by the Issuer and to make payments in accordance with those calculations on each monthly Payment Date.  [Exh. D (Administrative Agency Agreement), §§ 2.01(b), 2.04 and 10.10].

25.     The Defendant has admitted that in performing its duties in preparing the monthly Payment Date Schedules and calculating the amount of the various distributions to be made under the Indenture, the Administrative Agent acts as the agent for the Defendant.  [Exh. E (Transcript from May 13, 2019 hearing) (the "*May 13, 2019 Hearing Transcript*"), at 4.]

C.     **THE NORMAL OPERATION OF FAN'S BUSINESS AND DISTRIBUTIONS UNDER THE OPERATIVE DOCUMENTS**

    (1)     AMOUNTS DUE AND PAYABLE DETERMINED BY ADMINISTRATIVE AGENT AND ITS PREPARATION OF PAYMENT DATE SCHEDULES

26.     The Indenture establishes the following procedure for the Issuer to make payments on each Payment Date:

    (a)     First, the Administrative Agent calculates the amounts "due and payable" on each Payment Date and prepares a so-called "*Payment Date Schedule*" which it distributes at least two business days prior to the Payment Date. *See* Indenture § 3.06.  Specifically, for the associated Payment Date, the Payment Date Schedule sets forth for each series of Notes "the amount to be applied on such Payment Date to pay all interest, principal and

8

premium, if any, on such Series of Notes, . . . ."   [Exh. B (Indenture),

§ 3.06(h)].  The amounts listed in each Payment Date Schedule control all

amounts payable under the Indenture, including:

    (i)    amounts payable under Section 3.07 of the Indenture, which are required to be made "in accordance with the Payment Date Schedule"; [Exh. B (Indenture), § 3.07];

    (ii)    regular distributions under Section 3.08(a) of the Indenture, which are also required to be made "in each case accordance with the Payment Date Schedule"; [Exh. B (Indenture), § 3.08(a)];

    (iii)    distributions after an Event of Default, which similarly also are required to be made "as provided in the Payment Date Schedule"; [Exh. B (Indenture), § 3.08(b)]; and

    (iv)    Engine Disposition (as defined in the Indenture, "*Engine Disposition*") distributions, which are also governed by the amounts listed in the Payment Date Schedule.  [Exh. B (Indenture), § 3.08(c)].

Indeed, the Payment Date Schedule actually controls all amounts payable

under the Indenture.  [Exh. B (Indenture), § 3.07(d) (creating a category of

authorized payments to the extent listed in a Payment Date Schedule)].

    (b)    Second, the Administrative Agent directs payments of the amounts set

forth in the Payment Date Schedule.  [Exh. B (Indenture), § 3.08].

27.    Section 3.08(a) of the Indenture contains an ordinary-course, non-default payment

waterfall which sets out, among other things, payments and distributions to both holders of Notes

and the holder of the E Certificate.  [Exh. B (Indenture), § 3.08(a)].

28.    The non-default distribution waterfall provided under Section 3.08(a) of the

Indenture is deliberately drafted so that there can be no breach of payment obligations by the

Issuer if it makes all payments on the Payment Date in accordance with the Payment Date

Schedule.  [Exh. B (Indenture), § 3.08(a)].

**(2)**  **RIGHT TO EFFECT ENGINE DISPOSITIONS**

29.     The Indenture also provides for how the proceeds of Engine Dispositions are to be distributed.  So long as there is no Event of Default under the Indenture, the Issuer may sell Aircraft Engines if, among other situations, (a) the proceeds from such Aircraft Engine disposition exceed the target price for such engine as specified in the Indenture (or the difference is made up with other cash amounts), and (b) not more than 15% of the Aircraft Engine portfolio is being sold during any six-month period.  [Exh. B (Indenture), § 5.02(g)(iv)].

30.     So long as there is no Event of Default in existence and a specified debt service coverage ratio test is met, the Indenture further provides that proceeds of Engine Dispositions within the first six years of the Securitized Loan Facility are to be allocated as follows:  (a) 105% of the principal amounts allocated for the sold Aircraft Engine is distributable to the holders of the Notes; and (b) the remainder is available for distribution to the holder of the E Certificate.  [Exh. B (Indenture), §§ 1.01 at 3 (definition of Allocable Note Balance), 3.08(c), 3.08(c)(i) and 3.08(c)(ii)].

31.     Because no Event of Default is in existence and the debt-service-coverage-ratio test has been satisfied during every payment period, the holder of the E Certificate is currently entitled to receive proceeds after the holders of the Notes have received 105% of the principal balance allocated for any particular Engine Disposition.  [Exh. B (Indenture), § 3.08(c)].

32.     As set forth above, even distributions of Engine Disposition amounts are governed by the amounts calculated by the Administrative Agent and set forth in the Payment Date Schedules.  [Exh. B (Indenture), § 3.08(c)].

**(3)**  **PRINCIPAL REPAYMENT METHODOLOGY UNDER OPERATIVE DOCUMENTS**

33.     The Indenture establishes payment arrangements that provide that there can be no payment default arising from the failure to pay principal amounts under the Indenture for the

Series A Notes until the Final Maturity Date for such Notes, which is fixed at October 15, 2043.

[Exh. A (Offering Memorandum), at 25; Exh. B (Indenture), § 4.01(b)].

34.     Consequently, although the Indenture established "expected" principal payments,

principal payments are *required* only when revenues from Aircraft Engine lease rentals or Engine

Dispositions are sufficient to fund such principal payments.  [Exh. A (Offering Memorandum),

at 25].

35.     Furthermore, during the first six years of these transactions (until October 31,

2019), absent the occurrence of an Event of Default or the failure to satisfy the debt-service-

coverage-ratio test (which test has always been satisfied), even if more cash is available for

distribution, the only ordinary-course principal that must be paid on any Payment Date is the

scheduled principal payment determined by the Administrative Agent.  [Exh. B (Indenture),

§§ 3.08(a)(iii) and (vii)].

36.     The Offering Memorandum explains that there can be no principal payment

default prior to the Final Maturity Date (which is October 15, 2043 for the Series A Notes):

> Although there are specified Scheduled Principal Payment Amounts for the . . .
> Series A Notes for each Payment Date, the amount of the principal payments
> actually made on the . . . Series A Notes on any Payment Date will not be fixed in
> amount but rather will depend primarily on the [lease rental payments] and other
> revenues collected during the preceding month and on the [expenses] and other
> items to be paid or funded on that Payment Date.
>
> ***A failure to pay Scheduled Principal Payment Amounts on the . . . Series A Notes
> on any Payment Date prior to the applicable Final Maturity Date will not be an
> Event of Default.***

[Exh. A (Offering Memorandum), at 25 (emphasis in original)].

37.     In this regard, the Offering Memorandum confirms that the credit "ratings on the

Notes address the likelihood of the timely payment of interest and the ultimate payment of principal

on each series of Notes by the applicable *legal* final maturity date . . . ."  The Issuer's ability to

repay principal in full at any time prior to such date has expressly "not been rated by any of the Rating Agencies." *See* Offering Memorandum, at 5.

38.     In sum, an Event of Default cannot be triggered by a failure to pay principal with respect to the Series A Notes until the occurrence of the Final Maturity Date for such Notes— which is October 15, 2043.  [Exh. A (Offering Memorandum), at 25; Exh. B (Indenture), § 4.01(b)].

### (4)     PAYMENT DEFAULTS UNDER INDENTURE LIMITED TO FAILURE TO PAY AMOUNTS LISTED IN PAYMENT DATE SCHEDULES

39.     Consistent with the foregoing limitations on payments required to be made under the Indenture, the Indenture also limits payment "Events of Default" to three situations (and, as discussed below, none of these encompasses supposed calculation errors by the Administrative Agent).  [Exh. B (Indenture), § 4.01(a), (b) and (c)].

40.     Section 4.01(a) addresses the failure to pay interest:

> [F]ailure to pay when due the Interest Amount on the Senior Series, and the continuance of such default unremedied for a period of five (5) Business Days after the same shall have become due and payable…

[Exh. B (Indenture), § 4.01(a)].

41.     Section 4.01(b) addresses the failure to pay principal:

> [F]ailure to pay the outstanding principal of any Note or failure to pay all accrued and unpaid Interest Amounts on any Note, in each case, on the applicable Final Maturity Date…

[Exh. B (Indenture), § 4.01(b)]; *see also* Exh. A (Offering Memorandum), at 33 and 195 (an Indenture default occurs only for the payment of outstanding principal after the Final Maturity Date).  As detailed above, there can be no principal payment Event of Default under the Series A Notes until October 15, 2043. *See supra* at ¶ 9.

42.     Section 4.01(c) addresses the failure to pay other (non-principal or interest) amounts:

> [F]ailure to pay any amount (other than a payment default for which provision is made in clause (a) or (b) of this Section 4.01) *when due and payable* in connection with any Note, to the extent that there are, on any Payment Date, amounts available for such payment in the Collections Account or under the Liquidity Facility, and the continuance of such default for a period of five (5) or more Business Days after such Payment Date…

[Exh. B (Indenture), §  4.01(c)]

43.     As detailed above, an amount can be "due and payable" only when it is set forth on the Payment Date Schedule, which is prepared and distributed by the Administrative Agent on behalf of the Defendant.  *See supra* at ¶¶ 26 – 28.

44.     Accordingly, as long as the payments are made pursuant to the Payment Date Schedule, there can be no breach of Section 3.08(a) of the Indenture and thus no payment default under Sections 4.01(a), (b) or (c) of the Indenture.

**D.    ALL PAYMENTS HAVE BEEN MADE IN
        COMPLIANCE WITH PAYMENT DATE SCHEDULES**

45.     As set forth above, and in compliance with the requirements of the Indenture, the Administrative Agent prepares the monthly Payment Date Schedules for the Securitized Loan Facility.  *See supra* at ¶¶ 26 – 28.   In so doing, it acts as the express agent for the Defendant (in the Defendant's capacity as Security Trustee).  *See supra* at ¶¶ 24-25.

46.     For each of more than sixty-five monthly Payment Dates from the closing of the Securitized Loan Facility through April 2019, the Administrative Agent has prepared a Payment Date Schedule.  A true copy of the Payment Date Schedule issued immediately before the April 15, 2019 Payment Date (the "*April 2019 Payment Date Schedule*") is annexed as Exhibit F to the accompanying Edelman Declaration.

47.     Each of the Administrative Agent's Payment Date Schedules, including the one issued immediately before the Defendant's issuance of its May 9, 2019 Default Notice, has confirmed that the debt-service-coverage-ratio well exceeds the required ratio of 1.10. [*See* Exh. B (Indenture), § 1.01 at 10 (definition of DSCR Amortization Event); Exh, F, at 3].

48.     Indeed, in the April 2019 Payment Date Schedule, the debt-service-coverage-ratio is 1.61—well in excess of the 1.10 level that could justify changes to the payment waterfalls under the Indenture. [*Id.*]

49.     As the Administrative Agent expressly confirmed on May 9, 2019, it has directed that all payments and distributions be made in accordance with the terms and conditions of the Indenture and the amounts set forth in each of its Payment Date Schedules, and all such payments have, in fact, been made. [Exh. G (Administrative Agent's Response)].

50.     As further confirmed by the Administrative Agent, the monthly payments and distributions of Engine Disposition proceeds have also complied with the provisions of the Indenture. [*Id.*]

51.     Indeed, the Defendant itself confirmed that all payments required to be made under the Administrative Agent's monthly Payment Date Schedules were properly made. [Exh. E (May 13, 2019 Hearing Transcript), at 3-4].

52.     In sum, all calculations and distributions made by the Administrative Agent have been effected in accordance with the Indenture.

E.     **EFFORTS TO CREATE A NONEXISTENT AND NONCOMPLIANT PAYMENT EVENT OF DEFAULT UNDER INDENTURE**

    (1)     **LOOMIS DIRECTS ISSUANCE OF DEFAULT AND ACCELERATION NOTICE FOR OTHER PAYMENT DEFAULT EVEN THOUGH CALCULATIONS AND DISTRIBUTIONS ARE BEING ADMINISTERED IN FULL COMPLIANCE WITH OPERATIVE DOCUMENTS**

53.     On or about May 1, 2019, Loomis issued a so-called Written Direction to Give

14

Default Notice to the Defendant.  [Exh. H (the "*Original Direction Letter*")].

54.     In the Original Direction Letter, Loomis instructed the Defendant to declare an Event of Default.  Loomis would benefit if a valid Default Notice were issued as the occurrence of an actual Event of Default would change the distribution waterfall for its benefit.  As set forth in the Original Direction Letter, Loomis' sole alleged basis for such request was that:

> The Administrative Agent has made distributions in violation of the Indenture, including in violation of Section 3.08(a) thereof and related definition and schedules.  Such improper distributions constitute an Event of Default under Section 4.01(c) of the Indenture.

[Exh. H (Original Direction Letter), at 1].

55.     As detailed *supra*, Section 3.08(a) of the Indenture merely details the priority of the regular distributions to be made on each Payment Date and provides that such amounts be paid as set forth in the Payment Date Schedule, while Section 4.01(c) establishes that a failure to pay certain amounts listed in the Payment Date Schedule on any Payment Date may constitute an Event of Default.  *See supra* at ¶¶26-27 and 42.

56.     The Original Direction Letter failed to address any of the explicit requirements of Section 4.01(c) or to identify: (a) which payment was missed; (b) the type of payment obligation supposedly in default; or (c) when the alleged payment default occurred.  The reason for such failure is that no payment required to be made under any Payment Date Schedule was ever missed.  [Exh. H (Original Direction Letter)].

57.     On or about May 7, 2019, in a *de facto* acknowledgment of the deficiency of the Original Direction Letter, Loomis issued a so-called Supplement to Written Direction to give Default Notice.  [Exh. I (the "*Direction Letter Supplement*")].  Collectively, the Original Direction Letter and the Direction Letter Supplement are referred to herein as the "*Direction Letter*".

58.     The Direction Letter Supplement elaborated on Loomis' purported grounds for instructing the Defendant to issue a notice of default, but did not actually establish that an Event of Default had occurred either as a matter of law or of fact.  [Exh. I (Direction Letter Supplement)].

59.     In its Direction Letter Supplement, Loomis claimed that a payment default existed under Section 4.01(c) of the Indenture because two distinct sets of calculations made by the Administrative Agent as the agent for Security Trustee were in error:  (a) calculations relating to payments following engine dispositions; and (b) calculations regarding regular distributions from the inception of the transaction.  [Exh. I (Direction Letter Supplement)].

60.     As detailed in the Administrative Agent's Response, neither allegation is supported by the facts or the terms of the Indenture.  Exh. G (Administrative Agent Response)].

61.     More importantly, even if there were any merit to allegations of miscalculations (and there is none), calculation errors by the Administrative Agent do not constitute an Event of Default under Section 4.01(c) or under any other provision of the Indenture.  [Exh. B (Indenture), § 4.01].

62.     To constitute a payment Event of Default under the Indenture, there must be a failure to pay amounts delineated in any Administrative Agent's Payment Date Schedule; in contrast, miscalculations by the Administrative Agent do not constitute a payment Event of Default under the Indenture.  [Exh. B (Indenture), §§ 4.01(a), (b) and (c)].

63.     The Administrative Agent is an agent of the Security Trustee in making the required calculations (*see supra* at ¶¶ 23-25), and so its purported miscalculations could never logically serve as an actionable Event of Default.  To hold otherwise would permit the Security

Trustee, acting through its agent, to create an Event of Default upon which it could then take enforcement actions.

64.     Accordingly, although Loomis invoked Section 4.01(c) (addressing the failure to pay non-principal or interest) amounts, in its Direction Letter it failed to identify any payment that was: (a) set forth in a Payment Date Schedule; *and* (b) not actually paid.  In fact, Loomis never alleged that the Administrative Agent has ever departed from the terms of any Payment Date Schedule at all.  [Exh. H (Original Direction Letter); Exh. I (Direction Letter Supplement].

65.     Each Payment Date Schedule is available to the Defendant and the Defendant could have (and should have) confirmed that all payments required to be so made on each Payment Date have been so made.

66.     The Defendant ignored a further infirmity in Loomis' allegations when it alleged that additional principal amounts payable to it (based upon the Administrative Agent's alleged miscalculations) were missed.  Principal payment defaults for the Series A Notes cannot arise until the October 15, 2043 Final Maturity Date – so Loomis' Direction Letter is about a quarter of a century too early.  *See supra* at ¶¶ 9, 33 and 36.

    **(2)     ISSUER, E CERTIFICATE HOLDER AND ADMINISTRATIVE AGENT DETAIL THAT NO EVENT OF DEFAULT HAS OCCURRED**

67.     In immediate response to the Loomis' Direction Letter Supplement, each of the Issuer, the holder of the E Certificate and the Administrative Agent (the agent of the Defendant) detailed by letter to the Defendant that Loomis' assertions were meritless and based upon errors of fact and misrepresentations regarding the terms of the Indenture.  [Exh. G (Administrative Agent's Response)]; *see also* Docket No. 1 at ¶¶ 64 – 82).

68.     First, in their responses, the Plaintiffs and the Administrative Agent reminded the Defendant that miscalculations by its agent cannot constitute a payment Event of Default (or any other type of Event of Default under the Indenture).  [*Id.*]

69.     Second, the Administrative Agent confirmed that it had properly made all calculations and distributions in accordance with the Indenture.   More specifically, the Administrative Agent represented that:

> The Administrative Agent is not aware of the occurrence or existence of any [of Loomis' claimed] defaults.  Specifically, the Administrative Agent disputes any claim that any distributions or calculation have been made in violation of the terms of the Indenture or the Administrative Agent Agreement.

[Exh. G (Administrative Agent's Response), at 3].

70.     Indeed, the Administrative Agent informed its principal (the Defendant) that Loomis' direction "is not supported by either the facts or the transaction documents" and is instead "based on numerous factual inaccuracies that Trustee would be negligent in relying on, specifically where it has direct access to information that expressly contradicts such claims." [Exh. G (Administrative Agent's Response), at 1].

71.     Further, each of the Plaintiffs and the Administrative Agent reminded The Defendant that the calculations and distributions made by the Administrative Agent under the Indenture, including the Payment Date Schedules and the distribution of the proceeds of Engine Dispositions were annually audited by KPMG, and that KPMG specifically noted that there were "no issues" arising with respect such calculations and distributions.  [Exh. G (Administrative Agent's Response)]; *see also* Docket No. 1 at ¶¶ 68 and 122).

72.     Prior to the Defendant's issuance of its Default Notice, sixty-five Payment Periods had elapsed and fourteen Engine Dispositions had occurred.  [Exh. E (May 13, 2019 Hearing Transcript), at 3-4, 6, 10-11 and 19].

73.     The Administrative Agent timely prepared its Payment Date Schedules covering each such prior Payment Dates (including those that dealt with Engine Dispositions).  [Exh. G (Administrative Agent's Response)].

74.     Finally, the Defendant was reminded that the Administrative Agent had, upon information and belief, consistently administered all Engine Dispositions and monthly Payment Date Schedules since the closing of the Securitized Loan Facility five and a half years ago (a period encompassing more than sixty-five (65) Payment Dates and fourteen (14) Engine Dispositions).  [*Id.*]

75.     Loomis' and the Defendant's failure to object to any of these multitude of distributions demonstrates at a minimum a "course of performance" agreement of the parties that bars an attack upon such agreement pursuant to N.Y. U.C.C. §§ 1-303(a) and 9-601(a).  [*Id.*]

**(3)     THE DEFENDANT IGNORES APPLICABLE TERMS OF INDENTURE AND ITS OWN AGENT'S ADMISSIONS IN ISSUING ITS NON-COMPLIANT DEFAULT NOTICE**

76.     Despite receiving the express admonition from its agent that there was absolutely no basis for issuing a Default Notice, and that it would be *negligent in relying* upon Loomis' allegations as the basis for a Default Notice, and willfully ignoring the detailed responses from the Plaintiffs, during the afternoon of May 9th, the Defendant recklessly issued the specious "Default Notice" document.  [Exh. J (Default Notice)].

77.     In the Default Notice, the Defendant both issued notice of an unspecified payment default and purported to accelerate the Notes.  [Exh. J (Default Notice), at 2].

78.     Like the Original Direction Letter and the Direction Letter Supplement, although the Default Notice allegedly invokes an Event of Default under Section 4.01(c) of the Indenture, it fails to identify any payment that was: (a) set forth in a Payment Date Schedule; *and* (b) not actually paid.  [*Id.*]

79.     The Defendant apparently recognized that Loomis' allegations are insupportable, as its Default Notice is expressly premised upon supposed defaults "contended" and "asserted" by Loomis, rather than upon any Events of Defaults that actually exist based upon facts and the terms of the Indenture.  [*Id.*]

80.     The Defendant further acknowledged its absolute reliance on Loomis' baseless allegations in admitting that it was acting only "[o]n the basis of the Events of Defaults asserted by [Loomis] in the Direction Letter" and that it issued the Default Notice solely due to the fact that it was "directed by Loomis to deliver the [Noncompliant] Default Notice."  [*Id.*, at 2].

81.     Rather than determining that an Event of Default has actually occurred and is continuing, the Defendant merely parroted Loomis' unsupported and baseless allegations, recklessly and willfully ignoring the actual terms of the Indenture and the actual applicable facts. [*Id.*]

**(4)     EVEN THOUGH THE DEFENDANT'S AGENT HAS ADMITTED THAT NO EVENT OF DEFAULT HAS OCCURRED UNDER THE INDENTURE, THE DEFENDANT <u>REFUSED TO RESCIND DEFAULT NOTICE AND ACCELERATION OF NOTES</u>**

82.     The Defendant's issuance of its Default Notice is in express breach of the terms of the Indenture and such Default Notice should be given no force or effect.

83.     Under the explicit terms of the Indenture, "Default Notices" are definitionally required to be based upon the express terms of the Indenture.  Specifically, "Default Notices" (as defined in the Indenture) are required to be made "pursuant to and in accordance with Section 4.02" of the Indenture.  [Exh. B, § 1.01 at 9 (definition of Default Notice), § 4.02].

84.     Section 4.02 of the Indenture, in turn, requires that Default Notices may be issued only if an actual "Event of Default occurs and is continuing."  .  [Exh. B, § 4.02].

85.     No "Event of Default" has "occurred" and is "continuing" and, accordingly, the Default Notice cannot and does not constitute a "Default Notice" within the meaning and under

the terms of the Indenture because the express requirement for such type of notice is that an actual Event of Default under the Indenture must have "occurred and be continuing". . [Exh. B, § 1.01 at 9 (definition of Default Notice), § 4.02].   Such requirement was expressly ignored by Loomis and the Defendant. [Exh. J (Default Notice)].   Again, (a) the Defendant's own agent has expressly admitted that no Event of Default exists and that Loomis' allegations of deviations from the terms of the Indenture are meritless and (b) even if such allegations were true, allegations of miscalculations by the Administrative Agent do not constitute any type of Event of Default under the Indenture. [Exh. G (Administrative Agent's Response)].   As the Defendant is fully aware, all payments required under each Payment Date Schedule were fully and timely paid.   [*Id.*]

86.     The Plaintiffs (through counsel) demanded that the Defendant immediately retract the Default Notice.   *See* Docket No. 1 (Complaint), at ¶ 81; Docket No. 25 (Defendant's Answer), at ¶ 81.

87.     At or about 5:00 p.m. on May 10, 2019, counsel for the Defendant informed the Plaintiffs' counsel that the Defendant refused to withdraw the Default Notice and stated that the Defendant would be pursuing its remedies under the Indenture and other Operative Documents. *See* Docket No. 1 (Complaint), at ¶ 82; Docket No. 25 (Defendant's Answer), at ¶ 82.

88.     After the Court entered the Injunctive Order, the Defendant withdraw its Default Notice.

## F.     CONTRACTUAL IMPACT OF EXISTENCE OF EVENT OF DEFAULT UNDER THE INDENTURE

89.     The existence of an Event of Default under the Indenture has a material impact upon the respective rights of the parties under the Indenture.   These ramifications include, without limitation:

(a)     the acceleration of all principal amounts of all Notes, which, as of the issuance of the April 2019 Payment Date Schedule, totaled

21

$122,866,559.39; [Exh. J (Default Notice), at 2 (declaring all principal and interest to be due and payable); Exh, F (April 2019 Payment Date Schedule), at 3 (detailing total outstanding Note obligations)].

(b)     Fan's loss of control over all collections, Engine Disposition proceeds and other bank accounts;  [Exh. B (Indenture), §§ 3.02((d), (e), (f) and (i); Exh. C (Security Agreement),  § 3.01(c)(ii)];

(c)     the Security Trustee having the right to effect the immediate appointment of a receiver;  [Exh. C (Security Agreement),  § 2.20];

(d)     the fundamental change in the payment and distribution schedule applicable to the Securitized Loan Facility – changing from the non-Event of Default distribution waterfall provided under Indenture Section 3.08(a) to the Event of Default distribution waterfall of Indenture Section 3.08(b), which, *inter alia,* accelerates the due date of principal on the Notes and diverts away amounts otherwise payable to the holder of the E Certificate holder;  [Exh. B (Indenture), §§ 3.08(a) and (b)]; and

(e)     a change to the parties entitled to receive and Engine Disposition proceeds; which, *inter alia,* diverts away amounts otherwise payable to the holder of the E Certificate.  [Exh. B (Indenture), §§ 3.08(c)].

**(G)     OPERATIVE       DOCUMENTS       CONTEMPLATE REFINANCING ON OR BEFORE SIXTH ANNIVERSARY; EFFECT OF DELAY IN ATTAINING A REFINANCING**

90.     Fan is entering into the final six months of its Securitized Loan Facility before material cash sweeps and interest step-ups start to occur under the terms of the Indenture. Specifically, on October 31, 2019 – the sixth anniversary of the closing date of the Securitized Loan Facility, the following changes occur under such facility:

(a)     to the extent there is available cash, the interest rate increases by 5% *per annum* on the Series A Notes;  [Exh. B (Indenture), §§  3.06(c)(iv); 3.08(a)(xiii)];[4]

(b)     to the extent there is available cash, there is a complete cash sweep to repay all outstanding principal, which must be repaid before the holder of the E

---

[4]  If there are insufficient funds to pay such stepped-up interest amounts, such will not constitute an Event of Default.  "A failure to pay Step-Up Interest as a result of insufficient funds from the Available Collections Amount on any Payment Date prior to the Final Maturity Date will not be an Indenture Event of Default." [Exh. A (Offering Memorandum), at 23].  Nor do the credit rating agencies rate the ability of the Issuer to have sufficient liquidity to pay such stepped-up interest.  [*Id.*]

Certificate [JEH] is entitled to receive any distributions; [Exh. B (Indenture), § 3.08(a)(vii)]; and

(c)     all Engine Disposition proceeds are used to pay any outstanding principal on the Series A Notes before any amounts are payable to the holder of the E Certificate.  [Exh. B (Indenture), § 3.08(c)(ii)].

In sum, the Indenture effectively provides for a cash sweep and increased financing costs payable to the Series A Notes from and after October 30, 2019.  Due to these substantial changes in the economics of the transactions, the Offering Memorandum contemplates that the Notes will be refinanced on or prior to such sixth anniversary of the closing (October 31, 2019).   Exh. A (Offering Memorandum), at 25-26].

Dated: New York, New York             Respectfully submitted,
      July 1, 2019

**VEDDER PRICE P.C.**

By: /s/ Michael J. Edelman
    Michael J. Edelman
    Daniel C. Green
    Marc B. Schlesinger
    1633 Broadway, 31st Floor
    New York, New York 10019
    Telephone:  (212) 407-7700
    Facsimile: (212) 407-7799
    E-Mail:  mjedelman@vedderprice.com
          dgreen@vedderprice.com
          mschlesinger@vedderprice.com

*Attorneys for Plaintiffs Fan Engine Securitization Limited and Jet Engine Holding S.à r.l.*

**<u>List of Exhibits annexed to the Edelman Declaration</u>**

| | |
|---|---|
| Exhibit A | Offering Memorandum |
| Exhibit B | Indenture |
| Exhibit C | Security Agreement |
| Exhibit D | Administrative Agency Agreement |
| Exhibit E | May 13, 2019 Hearing Transcript |
| Exhibit F | April 2019 Payment Date Schedule |
| Exhibit G | Administrative Agent's Response |
| Exhibit H | Original Direction Letter |
| Exhibit I | Direction Letter Supplement |
| Exhibit J | Default Notice |