**WHITE & CASE**

July 25, 2019

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
T +1 212 819 8200

whitecase.com

**VIA ECF**

The Honorable Naomi Reice Buchwald
United States District Judge, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

> **Re:**   *Fan Engine Securitization Limited, et al. v. Deutsche Bank Trust Company*
> *Americas – Case No. 19-cv-04318 (NRB)*

Dear Judge Buchwald:

This firm represents Intervenors Loomis Sayles Investment Grade Bond Fund, Loomis Sayles Bond Fund, Loomis Sayles Investment Grade Fixed Income Fund and NHIT: Securitized Credit Trust (collectively, the "Loomis Funds") in the above-referenced case.  In accordance with Rule 2(E)(1) of the Court's individual practices, Intervenors submit this letter outlining the substantive arguments in *Intervenors' Memorandum of Law in Opposition to Motion of Plaintiffs Fan Engine Securitization Limited and Jet Engine Holding S.A.R.L. for Summary Judgment That No Event of Default Has Occurred Under the Terms of the Indenture and Related Operative Documents* [Dkt. No. 37] (the "Opposition").[1]

Pursuant to this Court's order of June 26, 2019 [Dkt. No. 27], Plaintiffs filed a targeted, pre-discovery summary judgment motion based on the four corners of the Indenture on a threshold legal issue:  Plaintiffs' contention that there can be no Event of Default under the Indenture—even assuming the Noteholders have been dramatically underpaid, as the Noteholders contend—so long as Fan paid whatever was on the Administrative Agent's Payment Schedule.  Plaintiffs' attempt to circumvent the plain terms of the Indenture and continue paying amounts to Equity that are owed to the Noteholders should be denied for the following three reasons.

> **A.  Fan's Failure To Pay Amounts Owed To The Series A Noteholders When**
> **There Are Funds In The Collections Account To Pay Them Is An Event Of**
> **Default**

Section 3.08(a) of the Indenture sets out a detailed waterfall for the distribution of all cash that comes into Fan's Collections Account from its engine leases.  Indenture § 3.08(a).  Like any waterfall, Section 3.08 specifically provides that each step in the waterfall can only receive cash if all prior ranking amounts have been paid in full.  *Id.*  Section 3.01(c) further guarantees that "[n]o

---

[1]        Capitalized terms used but not defined herein have the meanings ascribed to them in the Opposition.

The Honorable Naomi Reice Buchwald, p. 2
July 25, 2019

withdrawal from or transfer from or to any Account shall be made except in accordance with the terms of this Indenture." *Id.* § 3.01(c). In this waterfall, "Scheduled Principal Payment Amounts" to the Noteholders rank fifth; payments to Equity rank last. *Id.* §§ 3.08(a)(v)(xvii). The Noteholders have submitted Fan's payments schedules from February and March 2019, which show zero dollars paid to the Noteholders for their Scheduled Principal Payment Amount, and hundreds of thousands paid to Equity instead. *See* Allman Decl. Exs. E and F. This shows that money was available in the Collections Account to pay the Noteholders under the waterfall, and that Fan simply breached the waterfall. This is an Event of Default under the unambiguous terms of Section 4.01(c), which is triggered by the Issuer's failure to pay "any amount due and payable" when there are funds in the Collections Account available to make such payment. Indenture § 4.01(c). It is also, alternatively, an Event of Default under Section 4.01(d), which is triggered by breaches of "any obligations" in the Indenture that have a material adverse effect on the Noteholders. *Id.* § 4.01(d); Opp. at 14-16, 22-23.

In their Motion, Plaintiffs downplay the repeated failure to pay the Noteholders what they are owed as mere "miscalculations by the Administrative Agent." *See, e.g.*, Mot. at 9, 12-16. But the Issuer's obligations to make payments and distributions in accordance with the terms of the Indenture are not superseded by an incorrect Payment Date Schedule. Plaintiffs cannot hide behind these "miscalculations." The obligation to repay the amounts owed to the Noteholders in accordance with the terms they agreed to falls squarely on Plaintiffs. Nothing in the express terms of Section 4.01(c) limits that Event of Default to failing to pay what the Administrative Agent listed on a Payment Date Schedule, as Plaintiffs urge—that Event of Default does not refer to Payment Date Schedules at all. *See* Indenture § 4.01(c); Opp. at 14-16.

Equally deficient is Plaintiffs' related contention that the Administrative Agent's Payment Date Schedule determines what is "due and payable" under the Indenture. That is meritless. The Issuer's core obligation is to repay the amounts borrowed from the Noteholders in accordance with the Indenture, and the Administrative Agent performs the math. The Indenture's payment obligations determine the Administrative Agent's calculations—not the other way around. Plaintiffs' reading renders the Indenture's detailed payment waterfall, and Noteholders' right to call an Event of Default if they are breached, both meaningless and toothless. Opp. at 16-18.

**B. Section 4.01(b) Does Not Preclude An Event Of Default For Failures To Pay Scheduled Principal Payment Amounts**

Plaintiffs rely on Section 4.01(b) of the Indenture to argue that there can be no Event of Default of any kind relating to the payment of "principal" until 2043. This Event of Default addresses a failure to pay all of the "outstanding principal" on the "Final Maturity Date," that is, the total outstanding amount still outstanding on the notes when they mature in 2043. This specific Event of Default for non-payment of total "principal" in 2043 does not ***preclude*** an Event of Default where the Issuer breaches its separate obligation to pay required monthly distributions of "Scheduled Principal Payment Amounts"—which are defined separately in the Indenture from "principal"—when there are funds available to do so in the Collections Account, which falls squarely within Section 4.01(c)'s catch-all for "any amounts" due and payable. Opp. at 20-21.

**WHITE & CASE**

### C. The Administrative Agent Is Not An "Agent" Of The Trustee

The Plaintiffs also repeatedly claim that the Administrative Agent is an agent of the Trustee, and therefore the Noteholders, such that the Noteholders are bound by the Administrative Agent's erroneous calculations. That is wrong, and deliberately confuses the various parties and agreements that comprise this transaction, because Plaintiffs are citing provisions of the Administrative Agency Agreement in which the Administrative Agent acts as an agent of the *Security Trustee*, not the Trustee or the Noteholders. *See, e.g.*, Edelman Decl. Ex. D, Administrative Agency Agreement at 1; *id.* § 2.01(b). In fact, the Trustee is not even party to the Administrative Agency Agreement. *See id.* at 1. The fact that DBTCA acts in both capacities does not make these two separate capacities the same. Furthermore, the facts show that the Administrative Agent does not act at the direction of the Trustee or the Noteholders—the Administrative Agent's calculations have underpaid the Noteholders millions of dollars, and the Administrative Agent flatly refused the Noteholders' requests to provide or discuss the calculations. This precludes any inference of direction or control, which is fundamental to any finding of agency. Opp. at 18-20.

### D. At The Very Least, The Loomis Funds Have Advanced A Reasonable Interpretation Of The Contract That Precludes Summary Judgment

This is far from the "rarest of cases" where the heavy burden required for pre-discovery summary judgment is met. Indeed, Plaintiffs' contention is contrary to the plain terms of the Indenture and the Event of Default provisions protecting the Noteholders from precisely the Issuer's actions. Thus, even if the Court does not adopt the Loomis Funds' interpretation of the Indenture at this stage, summary judgment must still be denied, because it is at the very least a competing reasonable interpretation giving rise to an ambiguity in the Indenture. This would require that both parties' interpretations be tested through extrinsic evidence and discovery. Opp. at 23-24.

Respectfully submitted,

*/s/ Kimberly A. Haviv*

Kimberly A. Haviv

cc:     All counsel of record (via email and ECF)