UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

========================================================

FAN ENGINE SECURITIZATION LIMITED and
JET ENGINE HOLDING S.À R.L.,

                    Plaintiffs,

                  -against-

DEUTSCHE BANK TRUST COMPANY
AMERICAS, as Trustee, Senior Trustee, Operating
Bank and Security Trustee,

                    Defendant,

and

LOOMIS SAYLES INVESTMENT GRADE BOND
FUND, LOOMIS SAYLES BOND FUND, LOOMIS
SAYLES INVESTMENT GRADE FIXED INCOME
FUND and NHIT: SECURITIZED CREDIT TRUST,

                   Intervenors.

Case No. 19-cv-4318 (NRB)

========================================================

**REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFFS FAN ENGINE SECURITIZATION LIMITED AND JET ENGINE HOLDING S.À R.L. FOR SUMMARY JUDGMENT THAT NO EVENT OF DEFAULT HAS OCCURRED UNDER THE TERMS OF THE INDENTURE AND RELATED OPERATIVE DOCUMENTS**

Michael J. Edelman, Esq.
Daniel C. Green, Esq.
VEDDER PRICE P.C.
1633 Broadway, 31st Floor
New York, New York 10019
Telephone: (212) 407-7700
Facsimile: (212) 407-7799
E-Mail: mjedelman@vedderprice.com
        dgreen@vedderprice.com
*Attorneys for Attorneys for* Plaintiffs Fan Engine
Securitization Limited and Jet Engine Holding S.à r.l.

Dated: August 7, 2019

Plaintiffs, by their attorneys, Vedder Price P.C., hereby submit this reply memorandum of law (a) in further support of their Summary Judgment Motion[1] and (b) in reply to (i) the response of Defendant Deutsche Bank Trust Company Americas, as trustee, senior trustee, operating bank and security trustee ("*Deutsche Bank*") [Docket No. 42] ("*DB's Response*") to the Summary Judgment Motion, and (ii) the Intervenors' memorandum of law in opposition to the Summary Judgment Motion [Docket No. 37] ("*Intervenors' Response*", and along with DB's Response, the "*Defendants' Responses*").[2]  In support thereof, Plaintiffs respectfully represent as follows:

## SUMMARY

No basis exists to allege that the Issuer committed a payment (or other) Event of Default under the Indenture.  The Intervenors' Response alleges that there have been underpayments in unspecified amounts on the Series A Notes due to miscalculations by the Administrative Agent. The Defendants' Responses, however, ignore the provisions of the Indenture and other Related Documents (as defined in the Indenture, collectively, the "*Operative Documents*") that establish that the Defendants (directly or indirectly), and not the Issuer, control the Administrative Agent's actions.  They further ignore the fact that their own Administrative Agent has repeatedly confirmed that no payment obligation has been breached and that for the past five and a half years (covering sixty-five payment periods and at least fourteen engine dispositions) it has

---

[1] *See* Docket Nos. 28 through 32 (collectively, the "*Summary Judgment Motion*"); the memorandum of law in support of the Summary Judgment Motion [Docket No. 30] is referred to as "*Plaintiff's Memorandum*".  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in Plaintiffs' Local Civil Rule 56.1 statement of uncontested material facts, dated July 1, 2019 (the "*Rule 56.1 Statement*").  References to paragraphs ("¶") refer to the corresponding numbered paragraphs in that Rule 56.1 Statement.  References to (a) Exhibits ("*Exh. [__]*") are to the Exhibits annexed to the Declaration of Michael J. Edelman, dated July 3, 2019 [Docket No. 29] (the "*Edelman Declaration*") and (b) Allman Exhibits ("*Allman Exh. [__]*") are to the Exhibits annexed to the Declaration of Keith Allman in support of the Intervenor's Response [Docket No. 38] ("*Allman Dec.*").  Intervenors' Local Civil Rule 56.1 counterstatement of facts dated July 25, 2019 is referred to herein as "*Intervenors' Rule 56.1 Statement*".

[2] Collectively, the Intervenors and the Defendant are referred to herein as the Defendants.

consistently applied the distribution calculations and mechanics, and has effected distributions, in each case in accordance with the terms of the Operative Documents.

The Intervenors now seek to transform a disagreement with an agent under their control (the Administrative Agent) into the basis for alleging a payment Event of Default against the Issuer.   In furtherance of such efforts, the Intervenors have misapplied the remedy and enforcement provisions of the Indenture in a manner that lacks basis under the express terms of the governing agreements.  The Intervenors' unsupported actions have plunged the Issuer into an immediate crisis, are materially undermining the Issuer's current refinancing efforts and are threatening the Issuer's continued viability.  The Plaintiffs respectfully request that the Court provide immediate redress by confirming that no Event of Default exists under the Indenture under the circumstances present here.  The Intervenors should not be permitted to declare payment (or other) Events of Default based upon the actions of their own agents.  Rather, the terms of the parties' contracts and consistent course of performance by the parties under such contracts should form the sole permitted basis for the Intervenors to pursue remedies.

## **REPLY**

## I.   ADMINISTRATIVE AGENT IS UNDER THE CONTROL OF DEFENDANTS IN PERFORMING ITS CALCULATION AND DISTRIBUTION DUTIES

The Administrative Agent is under the control of the Defendants when performing the "Bank Account Management Services" (as defined in the Indenture).  Such Bank Account Management Services are very expansive and, in fact, grant to the Administrative Agent the job of handling all monetary responsibility under the Indenture, from establishing the Accounts, (including the Collections Account), to calculating the monthly payment amounts, to administering and effecting the distributions – all of these functions are handled by the

Administrative Agent (and not the Issuer).[3]

As expressly stated in the Administrative Agency Agreement, the Administrative Agent "is acting exclusively as the agent of the Security Trustee and not in any agency or other capacity on behalf of any Issuer Group Member [the Issuer and certain Issuer subsidiaries]" in performing the Bank Account Management Services, and "no Issuer Group Member has any right to direct the Administrative Agent with respect to all or any aspect of the Bank Account Management Services."  *See* Exh. D, § 2.01(b).[4]  In this this regard, the Security Trustee, who was originally delegated primary responsibility for these matters, in turn has delegated to the Administrative Agent the responsibility for all Bank Account Management Services matters.[5]

The Defendants misleadingly invoke the fact that Deutsche Bank wears multiple hats to argue that the Administrative Agent is not under any Defendant's control.  *See* DB's Response, at 2; Intervenors' Response, at 19.  Specifically, the Defendants argue that Deutsche Bank's role as Senior Trustee does not establish that it can control the Administrative Agent when acting in that capacity, since it is Deutsche Bank as Security Trustee to which the Administrative Agent answers.  *Id.*  This claim is contradicted by the express chain of governance and control

---

[3] Bank Account Management Services include:  (a) establishing the Accounts; (b) making all calculations required under Indenture § 3.06 and preparing the Payment Date Schedules; (c) effecting all Payment Date withdrawals and transfers under Indenture § 3.07; and (d) directing the distribution of all Payment Date distributions under Indenture § 3.08 (which includes all of the distributions at issue in this suit).  *See* Exh. D, §§ 2.04(a) & (e).

[4] Further, although Indenture § 3.06 provides that "Issuer shall cause the Administrative Agent" to make Payment Date calculations, the Administrative Agent, the Security Trustee and the Issuer expressly agreed that the Administrative Agent is the exclusive agent of the Security Trustee (and not of the Issuer) with respect to the Administrative Agent's duties under § 3.06 of the Indenture (including its duties to calculate amounts payable and distributable each month).  *See* Exh. D (Admin. Agency Agreement), §§ 2.01(b), (c) & 2.04(e).

[5] *See* Exh. B (Indenture), § 3.01(c) ("The Security Trustee shall have sole dominion and control over the Accounts (including, *inter alia*, the sole power to direct withdrawals or transfers from the Accounts)", provided, that until the issuance of a Default Notice, the Administrative Agent shall also be "permitted to direct" withdrawals and transfers in accordance with the Operative Documents); Exh. C (Security Trust Agreement), § 2.07(b)(iv) (Security Trustee control any deposit account) & § 7.02 (Security Trustee control over any Collateral, including the Collection Account and the other Accounts).

contained within the Operative Documents, which are as follows:

- the Administrative Agent must comply with directions of the Security Trustee with respect to Bank Account Management Services; *see* Exh. D, § 5.01(b);

- the Security Trustee, in turn, is controlled by the "Controlling Party";[6]

- the "Controlling Party" is defined in the Indenture as the "Senior Trustee";[7]

- the "Senior Trustee", in turn, is defined, in relevant part, as the "Trustee of the Series A Notes (acting at the written direction of the Holders holding a majority of the Outstanding Principal Balance of the Series A Notes)."

In sum, Deutsche Bank, acting at the direction of the Intervenors, has the contractual right to direct the actions of the Administrative Agent. *Id.*[8]  Under the very authorities cited by the Intervenors,[9] this control by Deutsche Bank, as Senior Trustee, and the Intervenors, as the majority Series A Noteholders, satisfies the requirements for an agency relationship.[10]

---

[6]  *See* Exh. B (Indenture), § 4.12 (Senior Trustee, as Controlling Party, shall have "the right to direct the time, method and place of . . . exercising any trust or power conferred on the Trustee under this Indenture or the Security Trustee under the Security Trust Agreement"); *see also* Exh. C (Security Agency Agreement), § 7.02(a) ("Controlling Party,  in its sole discretion, . . . shall have, whether or not any default under the Indenture has occurred . . ., the sole and exclusive right . . . to direct the Security Trustee to take all action with respect to the Collateral [including the Collections Account]").

[7]  *See* Exh. B (Indenture), § 1.01 (definitions of "Controlling Party" and "Senior Trustee").

[8]  The Intervenors groundlessly contend that the Administrative Agent's "refus[al] to provide even basic information about its calculations to the Noteholders" undercuts Defendants' control.  First, there is absolutely no contention of any failure of the proper chain of control to elicit a response from the Administrative Agent.  Second, the Intervenors have actually admitted the exact opposite—the Administrative Agent has so responded to the Noteholders through the Trustee (i.e., using the proper chain of control).  *See* Allman  Exh. I (Administrative Agent response to Deutsche Bank who responds to the Intervenors).   To further rebut their obvious control of the Administrative Agent, the Defendants cite to provisions of the Indenture that provide limitations on liability or allow the Trustee discretion in how it exercises its duties (*see* Intervenors' Response, at 17-18; DB Response, at 3-4); such limitations and discretion are irrelevant in ascertaining the chain of control over the Administrative Agent.  Here, the Defendants (directly or indirectly), and not the Plaintiffs, control the Administrative Agent in performing Bank Account Management Services.

[9]  *See* Intervenors Response, at 19 (citing to *Nuevo Mundo Holdings v. PriceWaterhouseCoopers LLP*, No. 03 Civ. 0613, 2004 U.S. Dist. LEXIS 780, at *14 (S.D.N.Y. Jan. 22, 2004) (principal's control over agent signifies an agency relationship)).

[10]   Here, the express terms of the Operative Documents satisfy the three elements for the existence of an agency relationship as among the Controlling Parties, the Security Trustee and the Administrative Agent: "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking." See *Khodier v. Sayyed*, 348 F.Supp.3d 330, 342 (S.D.N.Y. 2018).  Accordingly, the Administrative Agent is the subagent of the Controlling Parties (through the Security Trustee).

The Defendants' control over the Administrative Agent bars their efforts to allege breaches under the Indenture caused by the Administrative Agent.[11]  This relationship and control regarding the Bank Account Management Services -- which covers the full scope of the matters raised by the Defendants (from calculating monthly payments to effecting distributions thereof) -- conclusively bars the Defendants from issuing a Default Notice against the Issuer.

## II.   THE ISSUER IS A PASSIVE ENTITY WHO HAS NEITHER BREACHED, NOR BEEN THE SUBJECT OF, ANY DEFAULT, UNDER THE INDENTURE

As Defendants admit, the Issuer is a "non-operating special purpose entity" with no employees and virtually no ongoing duties under the Indenture (Intervenor's Response, at 3-4, 5).  Indeed, its primary obligations under the Indenture are to *refrain* from interfering with the operation of that Indenture or with the performance by the Administrative Agent and Deutsche Bank of their duties under the Indenture.  *See, e.g.,* Indenture, Article V.  There are no allegations that the Issuer has violated any such obligations.  Additionally, the Intervenors repeatedly claim that the Issuer failed to make distributions as required under Section 3.08(a)(v) or to "explain its methodology."  Such contention lacks any basis -both calculations and distributions are handled by the Defendants' own direct or indirect agent– the Administrative Agent.[12]

### A.   NO PAYMENT DEFAULT EXISTS

---

[11]   In this regard, "it is a general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agency relationship." *Loughery v. Future Century Limousine, LLC*, No. 11 Civ. 5108 (PGG), 2013 WL 5355006, *6 (S.D.N.Y. 2013) (citations omitted).   Under well-established principles of agency law, "the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals." *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (2010).  Principals also are liable for both their agents and subagents – both sound in agency.  See, Restatement (Third) of Agency § 3.15 (Subagency).

[12]   The Intervenors' contention that the Issuer refused to provide its calculations to them is a complete misrepresentation. The Plaintiffs have promptly responded to the Intervenors' inquiries and repeatedly informed the Intervenors that the Plaintiffs do not possess such calculations which, although they appear correct, are prepared by the Administrative Agent (and not the Issuer).  *See* Allman Exhs. K and Complaint, Exhs. H & K.

The extremely limited classes of actions that can constitute an Event of Default by the Issuer are set forth at Section 4.01 of the Indenture.  As the Intervenors have acknowledged, neither Section 4.01(a) (interest payment defaults) or Section 4.01(b) (principal payment defaults) is relevant here.  *See* Intervenor's Response, at 7.  Defendants consequently have sought to shoehorn their claims into the miscellaneous payment default provision set forth in Section 4.01(c), which addresses the failure to pay amounts not addressed by Sections 4.01(a) and (b), and only when such amounts are "due and payable in connection with any Note."

As set forth in greater detail in the Plaintiffs' Memorandum, the Issuer's obligations to make payments to the Series A Noteholders (such as the Intervenors) is strictly limited to the amounts included within the Payment Date Schedules.  The Payment Date Schedules set forth "in respect of each Series of Notes, the amount to be applied on such Payment Date to pay all interest, principal and premium, if any, on such Series of Notes . . . ."  *See* Exh. B (Indenture), 3.06(h).  Such requirement applies to Scheduled Principal Payment Amounts, which are regular distributions covered under Indenture Section 3.08(a).  Such amounts are required to be made "in each case in accordance with the Payment Date Schedule."  *See* Exh. B (Indenture), § 3.08(a).

The Intervenors wholly ignore how payment obligations are determined and paid under the Indenture.  Such obligations are calculated, reported and distributed by the Defendants' own Administrative Agent, as set forth in the Administrative Agent's Payment Date Schedules.  *See* Rule 56.1 Statement, ¶ 9; *see also* Plaintiff's Memorandum, § II(B)(1).  Where, as here, there is no contention that the Issuer failed to pay any amounts set forth in the Payment Date Schedules, no payment default can exist.

**B.**     **NO OTHER DEFAULT EXISTS**

The Intervenors now (for the first time) claim that there is a non-payment default under Section 4.01(d) of the Indenture.  Specifically, the Intervenors allege that "[b]y making

distributions to the Equity before paying the Scheduled Principal Payment Amounts to the Noteholders, Fan has breached Section 3.08(a) and failed to comply with its obligation to pay in accordance with the waterfall set out therein." *See* Intervenors' Response, at 23.  This contention has no basis as Section 4.01(d) expressly excludes payment defaults, and the alleged failure to make payment under Indenture Section 3.08(a)(v) indisputably falls within that class of default.

Instead, Section 4.01(d) addresses "failure[s] by the ***Issuer*** to comply with any of the covenants, obligations, conditions or provisions binding on it . . . ." *See* Exh. B (Indenture, § 4.01(d)).   The Intervenors' sole breach allegations are under  (a) Section 3.08(a)(v) and (b) Section 3.01, but neither provision addresses obligations of the Issuer.   *See* Exh. B (Indenture).  Section 3.08(a) addresses the distribution obligation of the Administrative Agent, not the Issuer, and Section 3.01 pertains to accounts under the "sole dominion and control" of the Security Trustee and its agent, the Administrative Agent.  In other words, the Intervenors do not allege any "failure by the Issuer to comply" with the terms of the Indenture.  Furthermore, the Default Notice issued by the Defendants only alleges payment defaults – and not any type of default that could fall under Section 4.01(d).  *See* Exh. J.   In these circumstances, the Intervenors' claim that an Event of Default exists under Section 4.01(d) is meritless.

C. **ADMINISTRATIVE AGENT CONSISTENTLY CALCULATED PAYMENT DATE AMOUNTS IN COMPLIANCE WITH THE INDENTURE**

The Defendants repeatedly allege that the issuance of the Default Notice was proper because "principal" payment Events of Default exist.  Yet, both in the original Default Notice and in the Defendants' Responses, the Defendants have failed to identify ***any*** amount that has not been fully paid by the Issuer.  The Intervenors inability to allege a specific amount owing is indicative that there is no payment default under the Indenture.

The assertion of unliquidated principal payment defaults allegedly missed by the Issuer is

especially egregious here where the Intervenors' own Administrative Agent has repeatedly represented to the Defendants that all Scheduled Principal Payment Amounts have been paid and that no further principal is payable until the October 2019 step-up.[13]   As set forth above, the Plaintiffs do not control the Administrative Agent with respect to the Bank Account Management Services;[14] rather, the reason the Intervenors stopped receiving interim principal distributions is, as explained to them by the Administrative Agent, that "principal payments up to January 2019 exceeded the expected amount to be paid as of the Expected Final Payment Date due to engine sales *[sic]* hence no further amortization is required until [the October 2019 step-up]."  *See* Allman Exh. I.

The propriety of the Administrative Agent's calculations and distributions has been confirmed in numerous further ways.  The Administrative Agent has repeatedly confirmed that the proper amount of Series A Scheduled Principal Payment Amount has been paid to the Series A Noteholders.  *See* Exh. F (May 9, 2019 letter from Administrative Agent's counsel to Deutsche Bank's counsel, in which Administrative Agent confirms that its "application [of the Section 3.08(a) waterfall] has at all times been correct since the Initial Closing Date, and … the calculation of the computation of the "Scheduled Targeted Principal Balance" . . . has at all times [been] performed . . . according to the terms and conditions of the Indenture").  Indeed, distributions have been vetted under audits performed by KPMG.[15]

Rather than address any of these matters under the terms of the Indenture with respect to their own agent, the Intervenors resorted to enforcement actions against the Issuer who has

---

[13]  *See* Allman Exh. I.; *see also* Allman Edhs. E & F, at 2; Exh. F at 2.

[14]  Like the Intervenors, the Plaintiffs only have copies of the monthly Payment Date Schedules.

[15]  *See* Complaint, ¶¶ 40-47; Plaintiffs' Memorandum, at 14-15.

acted in perfect compliance with the terms of the Indenture.  Now, in their response, the Intervenors have resorted to making blatant misrepresentations to this Court about not receiving principal payments.  For example, the Intervenors' statement that "the [Series A] Noteholders had received only $59,629 in December 2018" is outright misleading.  *See* Allman Dec., ¶ 7.  In fact, the Payment Date Schedules show that the Series A Noteholders received an additional Supplemental Principal Payment Amount (from the prepayment of 105% of the principal amounts allocated for the sold Aircraft Engines) of almost ***$10.2 million*** that month.[16]  The Intervenors further misrepresent the record to this Court when they allege that "things got much worse" in February 2019 when they received "zero." In fact, the Series A Noteholders received ***$980,011.02*** in repaid principal that month.  Compare Intervenors' Response, at 10 with Allman Exh. E at 3.  The Noteholders also fail to report that their main collateral debt service protection under the Indenture – the debt service coverage ratio – remains fully satisfied.  *See, e.g.,* Rule 56.1 Statement, ¶ 47.

The Defendants' failure to identify a specific amount owed, and the Intervenors' own misrepresentation in their principal arguments to this Court explaining how they were underpaid, highlight the facial defect of their alleged principal payment default.  This lapse is egregious because the Defendants' complaint is in reality a dispute with their own agent's (or sub-agent's) calculations and the Plaintiffs have not in any way breached any of their responsibilities or obligations under the Indenture or related Operative Documents.

In sum, the Administrative Agent has acted at all times consistently and in conformance with the Indenture.  Rather than evidencing a payment or other default under the Indenture, what appears to have occurred here is that the Intervenors inquired about the

---

[16]  *See* Allman Exh. D (Dec. 2018 Payment Date Schedule), at 3.

payment streams under the Indenture and did not like the answers that they received from their agent.  Then, instead of seeking further clarification or redress through the governance channels established under the Indenture, the Intervenors fabricated a payment default to by-pass the governance channels established by consensual contract terms designed to ensure orderly administration of this securitization transaction.  This Court should not countenance the Intervenors' insupportable allegations of payment default.  The Intervenors should not be permitted to declare unsupported and unsubstantiated payment Events of Default based upon the perceived actions of their own agent or representative under their control.  Rather, the invocation of remedies under the Indenture should be limited to the terms of the Operative Documents supported by the parties' consistent course of performance over the past five and a half years.  To allow otherwise inflicts serious and potentially irreparable consequences upon the Issuer and JEH.

## **CONCLUSION**

For the reasons set forth herein and in the Summary Judgment Papers, the Plaintiffs respectfully request that this Court grant the Plaintiffs Summary Judgment Motion and such other and further relief as this Court deems just and proper.

Dated: New York, New York
       August 7, 2019

Respectfully submitted,

**VEDDER PRICE P.C.**

By: /s/ Michael J. Edelman
   Michael J. Edelman
   Daniel C. Green
   1633 Broadway, 31st Floor
   New York, New York 10019
   Telephone:  (212) 407-7700
   Facsimile: (212) 407-7799
   E-Mail:  mjedelman@vedderprice.com
           dgreen@vedderprice.com
*Attorneys for Plaintiffs Fan Engine Securitization Limited and Jet Engine Holding S.à r.l.*