UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
FAN ENGINE SECURITIZATION LIMITED and JET
ENGINE HOLDING S.A.R.L.,

               Plaintiffs,               **MEMORANDUM AND ORDER**

      - against -              19 Civ. 4318 (NRB)

DEUTSCHE BANK TRUST COMPANY AMERICAS, as
Trustee, Senior Trustee, Operating Bank and
Security Trustee,

               Defendant,

and

LOOMIS SAYLES INVESTMENT GRADE BOND FUND,
LOOMIS SAYLES BOND FUND, LOOMIS SAYLES
INVESTMENT GRADE FIXED INCOME FUND and NHIT
SECURITIZED CREDIT TRUST

               Intervenors.

------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Addressed in this opinion is plaintiffs' motion for summary

judgment, seeking a declaration that an event of default has not

occurred under the indenture and related operative documents that

govern the notes issued by plaintiff Fan Engine Securitization

Limited ("Fan Engine") in a securitization transaction. For the

following reasons, plaintiffs' motion for summary judgment is

granted.[1]

---

[1]    As filed, plaintiffs' motion also sought summary judgment on a
breach of contract claim. That aspect of plaintiffs' motion is denied without
prejudice since that claim was outside the scope of the motion authorized by

# I.  **Background**

This case was commenced on May 13, 2019, by the filing of a complaint.  The next day, plaintiffs filed an Order to Show Cause seeking a preliminary injunction and a temporary restraining order.  A hearing was held that afternoon.  At the Court's suggestion, the parties conferred after the hearing and agreed upon the form of a Temporary Restraining Order which the Court signed and filed on May 14, 2019 ("TRO").[2]

This controversy has its genesis in a trust indenture, dated October 31, 2013 (the "Indenture").  The parties to that indenture were the plaintiff Fan Engine as the Issuer, the defendant Deutsche Bank Trust Company Americas ("Deutsche Bank") as the Trustee, Phoenix American Financial Services as the Administrative Agent, and BNP Paribas as the initial Liquidity Facility Provider.

Plaintiff Fan Engine is an Irish special purpose entity that was established to securitize a fleet of aircraft engines.

---

the Court.  See Memorandum and Order, July 11, 2019 (ECF No. 36).  Under Federal Rule of Civil Procedure 56(b), a party can file a motion for summary judgment only after the close of all discovery unless the Court orders otherwise.  The Court previously authorized a pre-discovery motion for summary judgment based on the understanding that plaintiffs' motion would be limited, as consented to by the parties, to the issue of whether an event of default had occurred under the Indenture and related operative documents.  Accordingly, there will be no further reference to this aspect of plaintiff's moving memorandum to which no response by defendant or intervenors was required by the Court's directive.  See Id.

[2]   The Temporary Restraining Order dated May 14, 2019, requires, inter alia, defendant to withdraw the notice of default and the Administrative Agent to continue making distributions as if no default had occurred except that the Trustee would hold in escrow the distributions for E Certificate holders.  See ECF No. 3.

Parties' Rule 56.1 Stmts. ¶ 10.[3]  Fan Engine generates revenue primarily by leasing and selling aircraft engines it owns.  Id. at ¶ 10.  Together with related operative documents, the Indenture memorializes the securitization of plaintiff Fan Engine.  One of the related operative documents is an administrative agency agreement, dated October 31, 2013 (the "Administrative Agency Agreement").  Id. at ¶ 17.  The parties to this agreement are plaintiff Fan Engine as the Issuer, defendant Deutsche Bank as the Security Trustee, and Phoenix American as the Administrative Agent.  See Edelman Decl. Ex. D (ECF No. 29-4).  Under this Agreement, the Security Trustee appointed the Administrative Agent as its agent for the Bank Account Management Services as defined in the Agreement.[4]

Fan Engine issued, among other securities, Series A Notes and E Certificates under the Indenture.  Parties' Rule 56.1 Stmts. ¶ 18.  Over 70 percent of the Series A notes are beneficially held collectively by Loomis,[5] Id. at ¶ 15, which was granted leave to intervene by the Court in a telephone conference on June 20, 2019, following letter-briefing on the intervention issue.  See ECF Nos.

---

[3]  "Parties' Rule 56.1 Statements" refer to Plaintiffs' Rule 56.1 Statement and Intervenors' Rule 56.1 Counterstatement.

[4]  Under the Administrative Agency Agreement, the Issuer also appointed the Administrative Agent as an agent but only for the Issuer Group Services, as defined therein, such as preparing for Fan Engine board meetings and maintaining Fan Engine's books and records.

[5]  "Loomis" refers collectively to the following entities: Loomis Sayles Investment Grade Bond Fund, Loomis Sayles Bond Fund, Loomis Sayles Investment Grade Fixed Income Fund and NHIT Securitized Credit Trust.

10, 14, 22, 40.  The other plaintiff Jet Engine Holdings S.A.R.L. beneficially owns E Certificates, which represent beneficial ownership interests in the Issuer, Fan Engine.  Parties' Rule 56.1 Stmts. ¶ 13.

The Indenture establishes the terms of and process for distributions to the holders of Series A Notes and E Certificates. Two days before each Payment Date, the Administrative Agent prepares a "Payment Date Schedule" that sets forth the amounts to be paid with respect to Series A Notes and E Certificates. Indenture § 3.06(h).  The Administrative Agent delivers the Payment Date Schedule to the Trustee, noteholders, and certificate holders.  Id.  On each Payment Date, the Administrative Agent makes distributions pursuant to the Payment Date Schedule by transferring the funds in the Accounts.  Id. § 3.08(a).  Even after the distributions are effectuated, each recipient of distribution "is obligated to hold for the benefit of the Senior Claimant any amounts received by such [p]erson which, under the terms of the Indenture, should have been paid to or on behalf of the Senior Claimant and to pay over such amounts to the Trustee for application as provided in Section 3.08[.]"  Id. § 10.01(a).

Intervenors issued to defendant—as the Senior Trustee and Trustee—a direction letter on May 1, 2019, and a letter supplement on May 6, 2019, instructing defendant to issue Fan Engine a notice of default.  Parties' Rule 56.1 Stmts. ¶¶ 53, 54, 57, 59; see also,

4

Edelman Decl. Ex. H (ECF No. 29-8); Edelman Decl. Ex. I (ECF No. 29-9). In those letters, intervenors alleged that an event of default had occurred under Section 4.01(c) of the Indenture because the distributions made by the Administrative Agent did not comport to the priority scheme specified in Section 3.08(a). Parties' Rule 56.1 Stmts. ¶ 54. The intervenors proffered that the Payment Date Schedules prepared by the Administrative Agent did not accurately reflect their entitlements under the Indenture and distributions made in accordance with those Payment Date Schedules necessarily constituted a failure to pay any amount that was "due and payable" under Section 4.01(c).[6] Id. at ¶ 59. Given the intervenors' holding of more than 70 percent of the outstanding Series A Notes, defendant Deutsche Bank issued a notice of default on May 9, 2019, citing Section 4.01(c) of the Indenture, in reliance on the intervenors' contention. May 13, 2019, Conference Tr. (ECF No. 12) at 9; Parties' Rule 56.1 Stmts. ¶ 1; see also, Edelman Decl. Ex. J (ECF No. 29-10). Plaintiffs' response was this lawsuit, challenging the notice of default.

Following the entry of the TRO, granting of Loomis' motion to intervene, exchanges on an appropriate briefing schedule and with

---

[6]    The Administrative Agent has disputed that there was any error in its calculations. At oral argument, the Court asked the parties whether the Administrative Agent had reviewed its calculations of past Payment Date Schedules as provided for in the TRO. Plaintiffs indicated that the Administrative Agent performed the recalculation, but had not changed its position on the accuracy of the Payment Date Schedules. See Oral Arg. Tr. 3.

the Court's involvement, the parties arrived at an agreed-upon briefing schedule, which was endorsed by the Court on June 26, 2019.  See ECF No. 27.  As noted earlier, the Court made clear in its Memorandum and Order of July 11, 2019, that the plaintiffs' motion for summary judgment was limited to the issue of whether an event of default has occurred under the Indenture and related operative documents.  See ECF No. 36.  Oral argument on this motion was held on September 16, 2019. [7]

## II.  **Discussion**

A. **Legal Standards**

In this motion, plaintiffs seek the entry of summary judgment in the form of a declaration.  This request for relief implicates two of the Federal Rules of Civil Procedure.

---

[7]      On August 9, 2019, plaintiffs requested for expedited consideration of this motion, stating that the ongoing dispute as to whether an event of default had occurred under the Indenture was significantly undermining the Issuer's efforts to refinance the notes at issue and was threatening its continued viability.  See ECF No. 50.  Under the Indenture, on October 31, 2019, the annual interest rate for the Series A Notes will increase by 5 percent and the Series A noteholders will start collecting all cash available in the Collections Account until there is no longer any principal outstanding. Parties' Rule 56.1 Stmts. ¶ 90; Indenture § 3.08(vii) & (xiii).  Plaintiff Fan Engine would have to embrace the impact of these changes unless it completes refinancing by October 31, 2019.   Referring to these imminent changes, plaintiffs, in their motion papers and at oral argument, have called into question the intervenors' motive in issuing a notice of default.  See Oral Arg. Tr. 20.  Because there has been no discovery yet in this action, the Court does not make any finding as to the intervenors' motive.  Still, being mindful of the consequences of the cash-sweep and interest rate hike for plaintiff Fan Engine, the Court held an oral argument on September 16, 2019, and has considered this motion on an expedited basis.  See ECF No. 52.  Thus, on September 19, 2019, this Court filed a brief decision highlighting the rulings fully set out herein.  See ECF No. 53.

i. **Federal Rule of Civil Procedure 56**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under New York law, which controls the Indenture and related operative documents, "the initial interpretation of a contract is a matter of law for the court to decide." International Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002). "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." Cable Science Corp. v. Rochdale Village, Inc., 920 F.2d 147, 151 (2d Cir. 1990). "Contract language is ambiguous if it is capable of more than one meaning." Matter of MPM Silicones, L.L.C., 874 F.3d 787 (2d Cir. 2017).

At the same time, "[a] written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." Brad H. v. City of New York, 951 N.E.2d 743, 746 (N.Y. 2011). Moreover, "parties are not free to interpret a contract in a way that frustrates the purpose of that contract or that makes any provision of the contract meaningless." Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc., 754 F. Supp. 2d 616, 624 (S.D.N.Y. 2010) (citing UBS Securities LLC v. Red Zone LLC, 77 A.D.3d 575, 578 (N.Y. App. Div. 2010)).

Once the court concludes that a contract is unambiguous, "[t]he proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." Omni Quartz, Ltd. V. CVS Corp., 287 F.3d 61, 64 (2d Cir. 2002).

### ii. **Federal Rule of Civil Procedure 57**

Federal Rule of Civil Procedure 57 governs the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201, the Declaratory Judgment Act.  The Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . , any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201 (a).  In determining whether to exercise jurisdiction over an action for declaratory relief, a district court should analyze "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." Dow Jones & Co. v. Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003). We exercise declaratory judgement jurisdiction here because the declaration plaintiffs are seeking, if granted, will help clarify the rights of the parties under the Indenture and the validity of the notice of default previously issued by defendant.

B. **Analysis**

i. **Intervenors' Position**

We begin with an overview of the intervenors' position. Intervenors allege that the Payment Date Schedules prepared by the Administrative Agent contained calculation errors.[8]    More specifically, they claim that, under the Indenture's priority scheme, a portion of the amounts specified in the Payment Date Schedules as distributions for the E Certificate holders should have been allocated to distributions for the Series A noteholders. According to intervenors, distributions made pursuant to those allegedly erroneous Payment Date Schedules triggered an event of default under Section 4.01(c) and 4.01(d) of the Indenture. Section 4.01(c) provides an event of default for:

> Failure to pay any amount . . . when due and payable in connection with any Note, to the extent that there are, on any Payment Date, amounts available for such payment in the Collections Account or under the Liquidity Facility, and the continuance of such default for a period of five (5) or more Business Days after such Payment Date.

Indenture § 4.01(c).  Section 4.01(d) provides an event of default for:

> Failure by the Issuer to comply with any of the covenants, obligations, conditions or provisions binding on it under

---

[8]    Despite alleging calculation errors, intervenors have not specified which of the past Payment Date Schedules contained errors and how much they were underpaid because of those errors.  It appears that the intervenors' failure to particularize their allegation to specific Payment Date Schedules results from their failure to obtain information regarding calculations.  <u>See</u> Intervenors' Mem. of Law in Opp. to Mot. for Summ. J. (ECF No. 37) at 15.  The Court does not further inquire into the scale of alleged errors by the Administrative Agent because this issue is irrelevant to this motion.

the Indenture, the Security Trustee Agreement or the Notes
(other than a payment default for which provision is made
in clauses (a), (b) or (c) above), if such failure or such
breach materially adversely affects the holders of the
[Series A Notes] and continues for a period of 10 days or
more. . . .

Indenture § 4.01(d). Intervenors claim that, even if the Court
were to conclude that the distributions allegedly made in violation
of the Indenture do not trigger an event of default under Section
4.01(c), such distributions would still trigger one under Section
4.01(d).

### ii. **The Issuer's Lack of Authority to Effectuate Distributions**

Given the intervenors' position that the alleged calculation
errors by the Administrative Agent result in a default by the
Issuer, we explore the Issuer's role, if any, in making the
allegedly erroneous distributions. The parties do not dispute
that calculating the amounts of and effectuating the distributions
at issue are part of "Bank Account Management Services" as defined
in the Administrative Agency Agreement. See Edelman Decl. Ex. D
(ECF No. 29-4), § 2.04; Oral Arg. Tr. 3-4; Parties' Rule 56.1
Stmts. ¶ 24. In performing those services, the Administrative
Agent acts as the agent of the Security Trustee. Id. That
relationship between the Administrative Agent and the Security
Trustee is further confirmed by Section 2.01(c) of the
Administrative Agency Agreement, which provides that "the
Administrative Agent, in performing the Bank Account Management

Services, is acting exclusively as the agent of the Security Trustee and not in any agency or other capacity on behalf of any Issuer Group Member," including the Issuer. Edelman Decl. Ex. D (ECF No. 29-4) § 2.01(c) (emphasis added).

Significantly, the Issuer does not have any control over the Collections Account and Engine Disposition Account (collectively, "Revenues Accounts"), from which the allegedly erroneous distributions were made. See Oral Arg. Tr. 5-6; Indenture § 3.01(c) ("The Security Trustee shall have sole dominion and control over the Accounts (including, inter alia, the sole power to direct withdrawals or transfers from the Accounts)"). The parties do not dispute that the revenues generated by the Issuer are directly deposited into the Revenues Accounts by the Issuer's counterparties in engine lease or sale transactions without any involvement by the Issuer. See Oral Arg. Tr. 5; Indenture § 3.02(a)(i) ("The Issuer shall cause the Servicer to direct all Lessees to remit directly to the Collections Account"); Indenture § 3.02(f) ("The Issuer shall, and shall cause each Issuer Subsidiary to, cause each purchaser of an Engine in an Engine Disposition to remit directly to the Engine Disposition Account the Net Sales Proceeds for such Engine Disposition"). Moreover, once those revenues are deposited in the Revenues Accounts, the Issuer has no authority to withdraw or transfer funds therein

because it does not have signatory authority over those Accounts.[9]
See Oral Arg. Tr. 5-6; see also, Indenture § 3.01(c).  Simply put,
the Issuer is absolutely powerless to effectuate distributions
with the funds in the Revenues Accounts.[10]

Having set out the structure of the securitization
transaction in the Indenture, we now turn to our evaluation of the
merits of the intervenors' position.

### iii. **Event of Default under Section 4.01(c)**

Intervenors argue that there was an event of default under
Section 4.01(c) of the Indenture because there was a failure to
pay an amount that was "due and payable."  Intervenors maintain
that they did not receive distributions in amounts that were "due
and payable" under the Indenture because they received only the
amounts specified in the allegedly erroneous Payment Dates
Schedules, which allegedly failed to accurately reflect their
entitlements under the Indenture, i.e. the amounts that were
actually "due and payable."

The intervenors' argument is not novel.  In a very similar
case, Judge Pauley in this District entertained and rejected the

---

[9]     It appears from the Indenture and related operative documents that
the only entities with signatory authority over the Revenues Accounts are the
Security Trustee and the Administrative Agent, as a delegate of the Security
Trustee.  In fact, the parties do not dispute that those two entities are the
only ones capable of transferring the funds in those Accounts.
[10]     In their reply brief and at oral argument, plaintiffs argued that
the Administrative Agent was also an agent of defendant as the Trustee.  The
Court does not entertain this argument at this time because a finding on that
issue is not necessary in resolving this motion.

argument advanced here by intervenors. In <u>U.S. Bank National</u>
<u>Association v. Barclays Bank PLC, et al.</u>, No. 11 Civ. 9199, 2013
WL 1180414, at *1 (S.D.N.Y. Mar. 12, 2013), the trustee and
noteholders disputed whether there was an event of default under
the indenture that governed the notes issued by a securitization
entity, which owned commercial real estate debt securities. In
<u>U.S. Bank</u>, the collateral manager selected the securities to be
held by the issuer, classified those securities based on their
performances and prepared the "Payment Report"—which specified
distribution amounts for various classes of noteholders—based on
its classification of the securities. <u>Id.</u> The trustee was then
required to make distributions "in accordance with the Payment
Report." <u>Id.</u> at *2. Indisputedly, the collateral manager
misclassified some of the securities held by the issuer. <u>Id.</u>
Consequently, the noteholders claimed that the misclassification
of securities by the collateral manager resulted in the senior
noteholders not receiving their full entitlements under the
indenture with the difference being paid to the junior noteholders.
<u>Id.</u> at *3. As intervenors do here, the noteholders there argued
that such erroneous distributions triggered an event of default as
a failure to pay any amount that was "due and payable." <u>Id.</u> at
*5. Noting that the word "payable" was not defined in the
indenture, Judge Pauley referred to dictionary definitions of the
word "payable" and concluded that a "failure to pay any principal

triggers an [e]vent of [d]efault only when the [t]rustee has the ability to make principal payments but fails to do so." Id. at *5-6. Judge Pauley then proceeded to hold that there was no event of default, reasoning that, because the trustee, which was in charge of effectuating distributions, could "only issue payments 'in accordance with a Payment Report,'" there could be no "payable" amount outstanding as long as the noteholders had received distributions in the amounts specified in the Payment Reports. Id. at *6. In further support of this conclusion, Judge Pauley noted that interpreting the word "payable" in the manner advanced by the noteholders would frustrate the purpose of another provision in the indenture that provided a mechanism to correct the type of error alleged by the noteholders without triggering an event of default. Id. The Court finds Judge Pauley's reasoning in U.S. Bank persuasive.[11]

Applying Judge Pauley's reasoning here, the Court concludes that an amount is "payable" under Section 4.01(c) of the Indenture only when the amount is specified in a Payment Date Schedule. Otherwise, any calculation error made by the Administrative Agent would trigger an event of default, with potentially severe consequences to the Issuer, despite the undisputed fact that the Indenture is structured to give the Issuer neither an authority to

---

[11]    The U.S. Bank case was not cited by any of the parties in their briefs. At the outset of oral argument, the Court made hard copies of the decision available to the parties.

oversee the calculation nor any ability to take any action that would cure distribution errors stemming from any calculation error by the Administrative Agent or its principal, the Security Trustee.

Reading "payable" as we do leads to the conclusion that there has been no event of default under Section 4.01(c) of the Indenture. The Indenture provides that "[o]n each Payment Date, . . . the Administrative Agent shall distribute from the Collections Account, or direct the Trustee in writing to do the same, in each case <u>in accordance with the Payment Date Schedule</u>[.]" Indenture § 3.08(a) (emphasis added). This language of the Indenture is unambiguous: the Administrative Agent has an authority to distribute <u>only</u> the amount specified in the Payment Date Schedule. From this, it logically follows that any amount beyond the amount specified in the Payment Date Schedule is not "payable" under the Indenture because the Administrative Agent does not have an ability to make a distribution in that amount. Intervenors fail to cite any provision in the Indenture or Related Documents that grants the Administrative Agent any authority to make a distribution in an amount other than the one specified in the Payment Date Schedule. The parties do not dispute that the Administrative Agent has distributed, and the noteholders has received the amounts specified in the Payment Date Schedule. <u>See</u> Oral Arg. Tr. 17-18; Parties' Rule 56.1 Stmts. ¶ 64. Therefore, the Court concludes that there has been no event of default under

Section 4.01(c) of the Indenture because there has been no amount outstanding that the Administrative Agent could have, but failed to distribute.[12]

At oral argument, intervenors maintained that the existence of a clawback provision in the indenture at issue in U.S. Bank renders Judge Pauley's decision distinguishable. In particular, intervenors claimed that the indenture in U.S. Bank included an "express clawback mechanism" whereas the Indenture here does not. See Oral Arg. Tr. 8.

Regardless of what intervenors meant with the word "express," we reject the intervenors' reading of Judge Pauley's decision. Properly understood, Judge Pauley's opinion clearly indicates that the existence of a clawback provision was an additional ground supporting his conclusion on the meaning of "payable": the paragraph analyzing the significance of the clawback provision starts with the word "Further." 2013 WL 1180414, at *6. Judge Pauley's interpretation of the word "payable" is persuasive even without resort to the existence of a clawback provision.

Even assuming, arguendo, that Judge Pauley relied on the existence of a clawback provision in reaching his conclusion, our

---

[12]    Separate from the "due and payable" discussion, we note—although it forms no part of our holding—that the language following "due and payable" in Section 4.01(c) is "to the extent that there are, on any Payment Date, amounts available for such payment in the Collections Account . . . ." Indenture § 4.01(c) (emphasis added). Here, there has not been a suggestion that any amount of money available was left undistributed in the Collections Account, but only that the calculations by the Administrative Agent resulted in distribution of wrong amounts.

interpretation of Section 4.01(c) does not change because the difference between the clawback provision in the indenture at issue in U.S. Bank and the one set out in Section 10.01(a) of the Indenture at issue here is not substantial enough to make Judge Pauley's decision distinguishable.[13]  The clawback provision at issue in U.S. Bank and the provision in the Indenture are set out for ease of comparison:

| U.S. Bank | Fan Engine |
|---|---|
| **Section 13.1  Subordination** | **Section 10.01  Subordination of the Securities and other Subordinated Obligations** |
| (h)    In the event that notwithstanding the provisions of this Indenture, any Holder of any Class A-1 Note or Subordinate Interest shall have received any payment or distribution in respect of such Class A-1 Note or Subordinate Interest contrary to the provisions of this Indenture, then, unless and until all amounts payable to each Hedge Counterparty pursuant to Section 11.1(a)(iii) or to the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the case may be, shall have been paid in full in Cash, such payment or distribution shall be received and held in trust for the benefit of and shall forthwith | (a)    Each Holder, the Investors, each Service Provider, the Liquidity Facility Provider and each Hedge Counterparty agrees that its claims against the Issuer for payment of amounts are subordinate to any claims ranking in priority thereto as set forth in Section 3.08 hereof, including any post-petition interest (each such prior claim, a "Senior Claim"), which subordination shall continue until the holder of such Senior Claim (a "Senior Claimant"), or the Trustee on its behalf, has received the full cash amount of such Senior Claim. Each such Person is also obligated to hold for the benefit of the Senior Claimant any amounts received by such Person which, under |

_____

[13]    At oral argument, intervenors argued that, in U.S. Bank, it was the trustee that holds the erroneously distributed amounts in a trust and makes adjusted distributions. See Oral Arg. Tr. 8-9. The Court rejects this reading of the clawback provision at issue in U.S. Bank because it is plainly inconsistent with the language of that provision. The subject in the clawback provision at issue there is the holders of notes issued under the indenture, not the trustee. Therefore, under a natural reading of the provision, it is the noteholders, not the trustee, that would "[hold] in trust for the benefit of, and shall forthwith be paid over and delivered to, the [t]rustee." Scrivens Decl. in Supp. of Mot. for Summ. J., U.S. Bank, 11 Civ. 9199 (S.D.N.Y. Mar. 12, 2013), ECF No. 38-2.

be paid over and delivered to the Trustee which shall pay and deliver the same to the applicable Hedge Counterparty or the Holders of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes or the Class F Notes, as the case may be, in accordance with this Indenture; **provided**, that, if any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of this Indenture, including this Section 13.1.

the terms of the Indenture, should have been paid to or on behalf of the Senior Claimant and to pay over such amounts to the Trustee for application as provided in Section 3.08 hereof.

Scrivens Decl. in Supp. of Mot. for Summ. J., U.S. Bank, 11 Civ. 9199 (S.D.N.Y. Mar. 12, 2013), ECF No. 38-2; Indenture § 10.01(a).

Given the similarity between the error-correction mechanism in both indentures, Judge Pauley's reasoning with respect to the clawback provision is applicable here as well. Section 10.01(a) of the Indenture provides a mechanism for correcting distribution errors without declaring an event of default. Adopting Judge Pauley's language to this case, "construing [Section 4.01(c)] in isolation as a 'hair trigger' would significantly undermine—if not completely frustrate—the purpose of [Section 10.01(a)]." U.S. Bank, 2013 WL 118014, at *6; see also, UBS Securities LLC v. Red Zone LLC, 77 A.D.3d at 579. As Judge Pauley noted, reading Section 4.01(c) as a "hair trigger" would violate one of the "basic canons of construction of contract law," namely that "specific language in a contract will prevail over general language where there is an

inconsistency between two provisions." GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C., 618 F.3d 204, 214 (2d Cir. 2010). The clawback provision in Section 10.01(a) deals more specifically with the situation of a noteholder or a certificate holder receiving a distribution in an amount that does not match his or her entitlement under the Indenture and thus provides a more targeted mechanism for redress rather than the "hair trigger" of Section 4.01(c).[14] [15]

### iv. **Event of Default under Section 4.01(d)**

Although both intervenors and defendant cited only Section 4.01(c) as the basis of an event of default in the direction letter and notice of default, in briefing the instant motion intervenors also contend that an event of default has occurred under Section 4.01(d). To put this argument in context, we quote Section 4.01(d) of the Indenture once again:

---

[14] As noted earlier, the parties dispute whether the Payment Date Schedules prepared by the Administrative Agent were actually erroneous. That issue, however, is irrelevant in applying Judge Pauley's reasoning here because the parties in U.S. Bank did not dispute that some of the Payment Reports prepared by the collateral manager actually contained errors. 2013 WL 1180414, at *3. Therefore, Judge Pauley's reasoning is applicable here even assuming, arguendo, that the Payment Date Schedules indeed contained errors as alleged by intervenors.

[15] At oral argument, intervenors maintained that they are entitled to, as one of the remedies available to them under the Indenture, issue a notice of default under Section 4.01(c) without first utilizing less drastic remedies available to them under the Indenture, such as: (1) asking the Trustee to invoke the clawback mechanism specified in Section 10.01(a) of the Indenture; and (2) directing the Senior Trustee and Trustee to direct the Security Trustee (pursuant to Section 4.03(a)(iii) of the Indenture) to request information relating to the Accounts (pursuant to Section 2.04(h) of the Administrative Agency Agreement). See Oral Arg. Tr. 42. Given our conclusion that there was no event of default, we need not resolve the legal validity of this position although we do have reservations as expressed during oral argument.

> Failure by the Issuer to comply with any of the covenants, obligations, conditions or provisions binding on it under the Indenture, the Security Trustee Agreement or the Notes (other than a payment default for which provision is made in clauses (a), (b) or (c) above), if such failure or such breach materially adversely affects the holders of the [Series A Notes] and continues for a period of 10 days or more. . . .

Indenture § 4.01(d).

Intervenors rely on two sections of the Indenture to assert that the Issuer, Fan Engine, has breached Section 4.01(d) in a manner that "materially adversely affects" them as the holders of Series A Notes, thereby triggering an event of default. First, intervenors argue that Fan Engine breached Section 3.08(a) of the Indenture, which specifies the priority in receiving distributions, by letting the Administrative Agent make some distributions to E Certificate holders before fully paying the Scheduled Principal Payment Amounts to the noteholders. Intervenors appear to further argue that the same distributions to E Certificate holders constituted a breach of Section 3.01(c), which provides that "[n]o withdrawal from or transfer from or to any Account shall be made except in accordance with the terms of this Indenture [and related documents.]"

The Court concludes that reliance on Section 4.01(d) is misplaced. This argument disregards the language of Section 4.01(d): "failure by the Issuer to comply with any of the covenants, obligations, . . . <u>binding on it</u>." Indenture § 4.01(d)

(emphasis added).  Intervenors point to no specific covenant or obligation binding on the Issuer that the Issuer breached.  As the parties agree, the Issuer was not involved in performing the allegedly inaccurate calculations nor in effectuating distributions based on the outcome of those calculations.  In fact, the Indenture at issue here was carefully designed to insulate the Issuer from any access to monies received or involvement in their distribution.  Indenture § 3.01(c) ("The Security Trustee shall have sole dominion and control over the Accounts (including, <u>inter alia</u>, the sole power to direct withdrawals or transfers from the Accounts)").[16]  Given these features of the Indenture, imposing on the Issuer an obligation to assure that the distributions be in accordance with the Indenture would also create an internal inconsistency by requiring a party to make sure that a process works properly when the contract specifically insulates the party from that process.  <u>Morse/Diesel, Inc. v. Trinity Industries, Inc.</u>, 67 F.3d 435, 439 (2d Cir.) ("The entire contract must be

---

[16]    At oral argument, intervenors stated that "the issuer has the ability to look at the payments and, if they are incorrect, engage with the Administrative Agent and say why that is the case."  The Administrative Agency Agreement provides that "[t]he Administrative Agent shall provide such information relating to the Accounts to the Security Trustee as it may reasonably request from time to time and as required under the Indenture."  Administrative Agency Agreement, § 2.04(h).  However, the Agreement does not include a parallel provision on the Administrative Agent's obligation with respect to the Issuer's request.

considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency.").[17] [18]

[17]   In their motion papers, intervenors suggested that interpreting Section 4.01(d) of the Indenture as limiting the Issuer's obligations to the amount specified in the Payment Date Schedule would make the priority scheme specified in Section 3.08(a) of the Indenture meaningless.  Intervenors' Mem. of Law in Opp. (ECF No. 37) at 17.  The Court disagrees.  The priority scheme governs the Administrative Agent's calculations in preparing the Payment Date Schedule.  See Indenture § 3.06(h) ("[T]he Issuer will cause the Administrative Agent to prepare and deliver . . . [the Payment Date Schedule] setting forth the payments, transfers, deposits and distributions to be made pursuant to Section 3.07 and Section 3.08(a)[.]") (emphasis added).  Clearly, the priority scheme under Section 3.08(a) still takes part in the Indenture's operation.

[18]   At bottom, it appears that all of the intervenors' arguments stem from the idea that Fan Engine as the Issuer has the ultimate obligation to ensure that the noteholders, regardless of disbursements consistent with the Payment Date Schedule, receive distributions that comport to their entitlements under the Indenture.  See Oral Arg. Tr. 6-7.  In addition to the gulf between this argument and the language and structure of the Indenture, the position that the Issuer should bear the potentially severe consequences of an error by an entity that is not its agent and over whom it has no control, when it lacks the power to remedy any possible error by that entity would seem—though we do not hold so here—to run afoul of a basic tenet of New York law: "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." Greenwich Capital Financial Products, Inc. v. Negrin, 74 A.D.3d 413, 415 (N.Y. App. Div. 2010).

## III. **Conclusion**

Having found no ambiguity in the Indenture and the interpretations advanced by intervenors unreasonable, the Court concludes that intervenors have failed to carry their burden to raise a question of material fact. For the reasons stated above, plaintiffs' motion for summary judgment seeking a declaration that no event of default has occurred under the Indenture and related operative documents is granted. This order resolves ECF Docket entry No. 28.

Dated:     New York, New York
           October 1, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

23